2003 VT 68

**STATE of Vermont v. Leland LAWRENCE**

[834 A.2d 10]

Nos. 02-181 & 02-182

¶ 1. July 18, 2003. Defendant Leland Lawrence appeals from orders of the Orleans District Court denying his motion to suppress evidence secured pertinent to his arrest for driving while under the influence of intoxicants, in violation of 23 V.S.A. § 1201, by a Vermont state police officer at the United States Port of Entry in Derby Line, Vermont, and denying his motions to dismiss the resultant criminal prosecution and companion civil suspension proceeding. On appeal, defendant argues that the trial court erroneously concluded that defendant's detention in the customs building at the border crossing prior to the arrival of the arresting officer was objectively reasonable. Defendant also claims the trial court erred in failing to find that defendant was unlawfully arrested by a United States customs inspector for violating 23 V.S.A. § 1201. We affirm.

¶ 2. On September 19, 2001, defendant and three adult male companions attempted to reenter the United States from Canada at the Derby Line Port of Entry. United States customs inspector A. Michael Richard was on duty at the primary inspection lane arriving from Canada when, at approximately 8:14 p.m., a vehicle driven by defendant entered the lane and was stopped for inspection. Inspector Richard posed customary screening questions to defendant and his companions regarding their citizenship and the purpose of their trip. Defendant informed the inspector that the group was returning from an adult entertainment club where they had con-

sumed alcohol. In the inspector's opinion, the answers provided by defendant and his passengers were given in a manner that was out of the ordinary for the current situation; that is, in the heightened security at the border eight days after the September 11 attacks on the United States. Inspector Richard then asked to examine the four men's driver's licenses and to inspect the vehicle. Inspector Richard kept the men's licenses in his possession throughout the rest of the inspection process.

¶ 3. Inspector Richard then inspected the interior of the vehicle. Upon opening the back area of the vehicle, inspector Richard smelled alcohol. He found, among other things, empty beer cans and an ice chest containing a partially empty, half-gallon bottle of vodka. After completing his search of the vehicle, inspector Richard asked defendant to pull his vehicle out of the primary inspection lane, park, and then enter the customs building for a secondary inspection. As defendant drove to the secondary inspection station, inspector Richard called the Vermont state police and notified them that he believed defendant "had consumed too much alcohol."

¶ 4. After entering the customs building, inspector Richard asked defendant and his companions to complete baggage declarations. Unable to immediately complete the secondary inspection, inspector Richard left defendant and the others in the customs building and returned to his post in the primary inspection lane to continue his inspections of other vehicles entering the country. According to inspector Richard, it was not unusual for people to have to wait "for whatever time period is necessary in order to complete the inspection." Inspector Richard then alternated between conducting primary inspections and finishing defendant's secondary inspection. When traffic subsided in the primary lane, Richard would "try to continue the processing [of defendant] by reviewing baggage declarations, [and] by inspecting the car."

¶ 5. At 9:23 p.m., Vermont state police Corporal Albert Stringer arrived at the border crossing. Inspector Richard relayed his observations to Corporal Stringer and showed the officer defendant's vehicle, the empty beverage containers, and the contents of the cooler. Inspector Richard then brought Corporal Stringer to the customs building, where Stringer confronted defendant. Corporal Stringer observed that defendant was unsteady on his feet, that his eyes were bloodshot and watery, and that a strong odor of intoxicants emanated from his person. Defendant admitted to Corporal Stringer that he had consumed four to five drinks prior to 8:00 p.m. Accordingly, Corporal Stringer administered three field sobriety tests, which provided further indicia of intoxication. Stringer also administered a nonevidentiary breath test, which indicated that defendant was impaired.

¶ 6. Defendant was then taken into custody by Corporal Stringer and transported to the state police barracks for processing, where he was advised of his Miranda rights. Defendant invoked his rights, and no further interrogation occurred. Defendant was then advised of his rights under the state's implied consent law, 23 V.S.A. § 1202. After acknowledging these rights and consulting with an attorney, defendant provided a breath sample for evidentiary testing. The results of this test indicated a blood alcohol content of 0.114%.

¶ 7. Defendant was charged with a violation of 23 V.S.A. § 1201(a)(2) for operating a motor vehicle on a public highway while under the influence of intoxicants and was issued a notice of driver's license suspension pursuant to the civil suspension statutory procedure. See 23 V.S.A. § 1205. A civil suspension hearing was held, at which defendant moved to dismiss the civil suspension case, averring that he was unlawfully seized and de-

tained by inspector Richard, and that evidence resulting from that seizure must be excluded. Subsequently, defendant filed a motion to suppress all evidence emanating from his detention and arrest in the criminal case and renewed his motion to dismiss in the civil suspension case. The trial court denied defendant's motions. Relying primarily on this Court's decision in *State v. Garbutt*, 173 Vt. 277, 790 A.2d 444 (2001), the trial court found that the "period and circumstances of the detention in secondary inspection ... were not objectively unreasonable, in consideration of the totality of the circumstances," and that Corporal Stringer had "reasonable grounds to believe that the Defendant had been operating a motor vehicle in violation of 23 V.S.A. § 1201." Judgment for the State was entered in the civil suspension proceeding. Defendant subsequently pled nolo contendere by waiver to the criminal charge against him. This appeal followed.

¶ 8. We have routinely observed that this Court reviews motions to suppress de novo. *State v. Chapman*, 173 Vt. 400, 402, 800 A.2d 446, 448 (2002); *State v. Pierce*, 173 Vt. 151, 152, 787 A.2d 1284, 1286 (2001) (reviewing denial of motion to suppress evidence obtained in connection with defendant's traffic stop de novo); *State v. Graves*, 170 Vt. 646, 646, 757 A.2d 462, 463 (2000) (mem.) (reviewing denial of motion to suppress results of breath test taken at port of entry de novo). However, we have applied a more deferential standard to the trial court's determination of underlying facts when ruling on a motion to suppress. See *State v. Sheehan*, 171 Vt. 642, 643, 768 A.2d 1275, 1277 (2000) (mem.) (when evaluating a motion to suppress, "[v]oluntariness is a question of fact"); *State v. Badger*, 141 Vt. 430, 444, 450 A.2d 336, 344 (1982) (noting that Court's job in reviewing a grant of a motion to suppress based on voluntary consent is "to determine whether the factual findings are sufficient to support the conclusion that the consent was involuntary as a matter of law"). Deferential appellate review of a trial court's factual findings on motions to suppress is appropriate because determining the weight of evidence and credibility of witnesses is primarily for the trier of fact. *Peckham v. Peckham*, 149 Vt. 389, 390, 543 A.2d 267, 269 (1988); *Commonwealth v. Moon*, 405 N.E.2d 947, 951 (Mass. 1980); *State v. Smith*, 684 N.E.2d 668, 685 (Ohio 1997). We have recently recognized that some courts consider the determination of voluntary consent in the context of a motion to suppress as a mixed question of fact and law necessitating a two-step approach: underlying findings of "historical" fact are reviewed under the clearly erroneous standard, while the court's ultimate legal conclusion is reviewed de novo. *State v. Sprague*, 2003 Vt. 20, ¶ 24, 175 Vt. 123, 824 A.2d 539. Similarly, other courts apply a deferential standard to underlying facts when the central legal issue present in the motion to suppress is the reasonableness of a seizure. *People v. Glaser*, 902 P.2d 729, 732 (Cal. 1995) (state supreme court defers to trial court's factual findings when supported by substantial evidence); *People v. Reynolds*, 445 N.E.2d 766, 769 (Ill. 1983) (appellate court will not disturb trial court's findings on motion to suppress unless findings manifestly erroneous); *Bies v. State*, 251 N.W.2d 461, 467 (Wis. 1977) (trial court's findings sustained unless against great weight and clear preponderance of evidence, but reviewing court independently determines if search reasonable); see also *State v. Ehly*, 854 P.2d 421, 427 (Or. 1993) (trial court's findings of historical fact on suppression motion binding on appellate court if sufficient evidence in the record to support them). If the trial court's findings of historical fact are not clearly erroneous, the appellate court then reviews the legal issues, such as the reasonableness of a seizure, de novo.

¶ 9. Ultimately, the determination we are asked to make in this and similar appeals from grants or denials of motions to suppress is a mixed question of law and fact; that is, whether the factual findings supported by the record lead to the conclusion, that, as a matter of law, suppression of evidence was or was not necessary. And since the trial court is in the best position to determine the weight and sufficiency of evidence presented, it is appropriate for this Court to apply a clearly erroneous standard to the underlying facts found ·by the trial court when reviewing appeals .from motions to suppress. As such, we explicitly adopt the two-step approach discussed in *Sprague* for reviewing motions to suppress. See 2003 Vt. 20, at ¶ 24. Here, we will apply a clearly erroneous standard to the trial court's underlying historical facts, while reviewing the ultimate legal conclusion, whether the seizure of defendant was reasonable given the underlying facts, de novo.

¶ 10. On appeal, defendant claims the evidence should have been suppressed because: (1) defendant's detention in the customs building prior to Corporal Stringer's arrival at the border crossing exceeded the scope and purpose of a routine border search, and as a result, (2) inspector Richard unlawfully arrested defendant for a violation of Vermont law when Richard detained defendant and his companions for a secondary inspection. To support these claims, defendant suggests that inspector Richard had completed enforcement of customs and immigration laws during the primary inspection of defendant and his companions, and that inspector Richard directed the group to the secondary inspection area because he suspected defendant was driving under the influence of intoxicants. According to defendant, because the customs officer was not a certified law enforcement officer with authority to enforce state law within Vermont, defendant's detention was unlawful in that it exceeded both the bounds of reasonableness and the authority conferred upon a customs officer to detain persons passing through the port of entry.

¶ 11. The Fourth Amendment to the United States Constitution mandates that searches and seizures be reasonable. Reasonableness depends upon all the circumstances surrounding each search and seizure. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). The permissibility of a particular law enforcement practice is judged by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* (internal quotation omitted). In the context of customs inspections, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *Id.* at 538. Given the government's important interest in "protect[ing] the Nation by stopping and examining persons entering this country," *id.*, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is ... struck much more favorably to the Government at the border." *Id.* at 540.

¶ 12. As such, the government has significant latitude to detain persons in a border-crossing context. *United States v. Butler*, 249 F.3d 1094, 1100 (9th Cir. 2001). "Routine searches of the persons and effects of entrants [at the international border] are not subject to any requirement of reasonable suspicion, probable cause, or warrant ...." *Montoya de Hernandez*, 473 U.S. at 538. As this Court has recognized, "[w]hen persons enter the United States at a border crossing, a routine search of those persons and their belongings without reasonable suspicion ... is per se reasonable." *State v. Coburn*, 165 Vt. 318, 321, 683 A.2d 1343, 1345 (1996). Moreover, customs agents have wide discretion in deciding which persons will be referred

to a secondary inspection area. *United States v. Martinez-Fuerte*, 428 U.S. 543, 563-64 (1976). Selective referral to a secondary inspection area is constitutional even if no particularized reason justifies that inspection. See *id.* (holding that those traveling by car may .be stopped near the border without individualized suspicion).

¶ 13. However, defendant contends that the government's power to search and detain individuals crossing the border is not unlimited, and that a routine checkpoint stop must be brief and unintrusive, citing *United States v. Rascon-Ortiz*, 994 F.2d 749 (10th Cir. 1993), for support.* Defendant argues that the secondary inspection conducted by inspector Richard exceeded the purpose and scope of a routine border search because Richard had determined that defendant and his passengers "had not violated any immigration or customs laws after an initial inspection." The record does not support defendant's assertion.

¶ 14. First, inspector Richard's testimony that, after the primary inspection and questioning, he had found no evidence of smuggling "at that point" does not establish that inspector Richard had concluded his customs inspection of the group. Defendant and his companions indicated that they had made purchases while in Canada. Inspector Richard then directed the group to the secondary inspection area, where they were required to complete proper baggage declarations. While customs agents do not necessarily

_____

* We note that the issues presented in *Rascon-Ortiz* arose in the context of immigration checkpoints forty miles from the international border inside the United States. 994 F.2d at 750. Here, the secondary inspection occurred at the international border, where customs agents have wide latitude to detain individuals. See *Montoya de Hernandez*, 473 U.S. at 540; *Butler*, 249 F.3d at 1100.

need a particularized reason to justify a secondary inspection, see *Martinez-Fuerte*, 428 U.S. at 562-63, it is incontrovertible that inspector Richard had the authority to refer defendant and his companions to the secondary inspection area for this purpose, as it was directly related to the enforcement of customs and immigration law.

¶ 15. Second, inspector Richard testified that during the secondary inspection he was "reviewing baggage declarations, [and] inspecting the car." The duration of this inspection, which lasted approximately one hour and nine minutes, was a function of Richard's need to inspect other vehicles arriving from Canada at the primary inspection lane. Moreover, detentions at the border lasting over an hour are not considered extraordinary. See *United States v. Fernandez-Ventura*, 132 F.3d 844, 848 (1st Cir. 1998) (one hour and twenty minute detention by customs agents neither extraordinary nor strongly indicative of an arrest). Inspector Richard's suspicion that defendant was driving while intoxicated does not alter this conclusion. Based on the record evidence, it is clear that the secondary inspection was reasonably related in both scope and duration to the purpose of the border stop — the enforcement of customs and immigration law. Thus, defendant's first claim on appeal fails.

¶ 16. Defendant's second claim on appeal is that his detention in the customs building during the secondary inspection and prior to Corporal Stringer's arrival constituted an unlawful arrest by inspector Richard for driving under the influence of intoxicants in violation of Vermont criminal law. Defendant argues correctly that customs inspectors have no authority to arrest individuals for violations of Vermont law without prior certification by the executive director of the state's criminal justice training counsel. See 20 V.S.A. § 2222 (certification providing federal law enforcement officers with

power of arrest for Vermont crimes requires completion of a course in Vermont laws and criminal procedure). The record establishes that inspector Richard was not certified to enforce Vermont criminal law in accordance with § 2222.

¶ 17. However, our holding that the secondary inspection was legitimate inexorably leads to the conclusion that defendant was not under arrest. Defendant and his companions were not physically restrained in the customs building and were allowed to move about freely in the area. Although the inspection lasted over an hour, the duration of defendant's detention was directly related to inspector Richard's responsibilities as a customs inspector and was reasonable for those purposes. Inspector Richard did retain the driver's licenses of defendant and his companions throughout both primary and secondary inspections, but again, that retention was part of a legitimate border inspection. Cf. *Butler*, 249 F.3d at 1098 ("[A] brief detention at the border by immigration and customs officials of persons presenting themselves for admission to the United States is not custody, even though such persons are not free to leave or to refuse to be searched."). Based on the totality of the circumstances, we conclude that the level of intrusion suffered by defendant during the secondary inspection did not rise to the level of an arrest. Cf. *Garbutt*, 173 Vt. at 284-85, 790 A.2d at 449-50 (holding that drivers exhibiting signs of intoxication who were detained by custom agents at Derby Line Port of Entry for up to seventy-five minutes in secondary inspection were not in custody for purposes of *Miranda*).

¶ 18. Consequently, defendant's second claim on appeal fails. Inspector Richard did not arrest defendant for a violation of 23 V.S.A. § 1201, and as a result, did not violate 20 V.S.A. § 2222. Defendant's arrest at the port of entry was the result of an independent investigation conducted by a Vermont state police officer exercising his proper authority to enforce Vermont criminal law. See *Graves*, 170 Vt. at 647, 757 A.2d at 463 ("Vermont has jurisdiction over crimes committed in the federal enclaves of ports of entry."). Therefore, the trial court properly denied defendant's motion to suppress evidence secured pertinent to his arrest, and as a result, properly denied defendant's motions to dismiss the civil suspension proceeding and criminal prosecution brought against him for driving under the influence of intoxicants in violation of 23 V.S.A. § 1201.

*Affirmed.*

Note. Justice Morse sat for oral argument but did not participate in this decision.