2012 VT 104

# State of Vermont v. Hieu Tran

[71 A.3d 1201]

No. 11-341

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed December 21, 2012

Motion for Reargument Denied January 15, 2013

150

*Thomas J. Donovan, Jr.*, Chittenden County State's Attorney, *Andrew R. Strauss*, Deputy State's Attorney, and *Ben Chater*, Law Clerk, Burlington, for Plaintiff-Appellant.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, and *Laura Ethington*, Legal Intern, Montpelier, for Defendant-Appellee.

¶ 1. **Skoglund, J.** This interlocutory appeal raises the question of whether defendant Hieu Tran was in police custody when two detectives questioned him in a police cruiser for one hour as part of an investigation into an assault and attempted robbery. The trial court concluded that the interview was a custodial interrogation conducted without the warnings guaranteed by *Miranda v. Arizona*, 384 U.S. 436 (1966), and granted defendant's motion to suppress. On appeal, the State argues that no warnings were necessary because defendant voluntarily spoke with detectives and was not in custody during the interview. We affirm.

¶ 2. Defendant was charged with assault and attempted robbery in violation of 13 V.S.A. § 608(a). Defendant filed a motion to suppress statements he made to police during an interview in March 2011. Defendant claimed that the statements were made in violation of his rights under the Fifth Amendment of the Federal Constitution and Chapter I, Article 10 of the Vermont Constitution because police conducted a custodial interrogation without providing defendant with the necessary *Miranda* warnings. The court held a hearing on the motion in August 2011. At the hearing, the only witness was one of the police detectives who interviewed defendant. In addition, a recording and transcript of the police interview were admitted.

¶ 3. At the suppression hearing, the detective described the following facts concerning the investigation and the challenged interview. In the early afternoon of March 23, two police detectives drove in an unmarked police car to defendant's residence to question him about his possible involvement in an assault and robbery that had occurred a couple of days earlier.

¶ 4. Prior to the interview, police had already compiled information regarding the assault and robbery from the victim, the victim's friend who was present at the scene, and a person in the neighborhood who witnessed the altercation. The investigation started when police were dispatched to an emergency room where a man was being treated for an assault, which required stitches on his hand. The information from the man led detectives to the place where the incident occurred. After speaking with a witness at the scene and the injured man's friend, police understood that the assault occurred during a drug transaction. Two perpetrators were involved, and one carried a gun. The victim's friend identified defendant as the suspect without a gun. Police recovered a baseball cap from the scene that reportedly belonged to defendant.

¶ 5. When the detectives arrived at defendant's residence, defendant's mother indicated that he was not at home and she was going to pick him up. Police followed her car when she left to get defendant. When defendant arrived back at home, police again went to the door and defendant came out onto the porch. Police asked defendant to meet in their car. The detective testified that he decided to conduct the interview in the police car to be more comfortable and to afford some privacy from defendant's mother and brother, who were at home. Defendant entered the front passenger seat. The officer could not remember if defendant or the other detective had shut the front door. The door remained unlocked during the interview. The detective testified he did not tell defendant that he *was* *not* free to leave, but on cross-examination agreed he did not tell defendant that he *was* free to leave. One detective sat in the driver's seat, and the other sat in the back seat. Both questioned defendant.

¶ 6. At the beginning of the interview, the detectives told defendant that they had spoken to the victim and other witnesses, that they knew something had happened and there was a fight, and that they wanted defendant to have a chance to explain his side of the story. The detectives asked defendant how the drug deal was set up. Defendant explained that the victim had initiated it by calling him. The detectives told defendant that they "already have the answers to some questions" and "know how it went down and where it went down and all of that stuff." In response to questions about the gun, defendant stated that the gun was fake and plastic. At one point, one detective directed defendant not to

play with his cell phone during the interview. The detectives explained to defendant that he could be charged with armed robbery even if he was not holding the gun because he was there and part of the deal. Defendant made little response to the questioning, stating that he did not have anything to say, and did not know or remember what happened. At one point, he admitted that he was there, and again stated the gun was not real. He admitted he lost his hat at the scene.

¶ 7. The detective testified that prior to the interview he believed there was probable cause to arrest defendant. The interview was recorded and lasted for about one hour. At the end of the interview, defendant was arrested.

¶ 8. The court made brief oral findings on the record. The court found that the circumstances of the questioning created a police-dominated atmosphere. The court found several factors demonstrated that defendant was in custody at the time of the interview and not free to leave. First, the court found it significant that prior to the interview police had enough information to arrest defendant and were, in fact, planning to arrest defendant at the close of the interview. The court emphasized that defendant would not have felt free to leave insofar as he was young, and had been told by police that they had information linking him to the assault and robbery. Finally, the court pointed to the physical conditions of the interrogation: two officers questioning defendant in a small space — a police car — for one hour.

¶ 9. The court subsequently denied the State's motion to reconsider the suppression decision. The State then moved for permission to appeal, asserting that several statements made during the interview were substantial proof of a material fact relevant to the proceeding. See 13 V.S.A. § 7403(c), (d) (allowing State to appeal from granting of motion to suppress in felony case as long as State certifies that suppressed evidence is substantial proof of relevant material fact or loss of evidence would seriously impede proceeding); V.R.A.P. 5(b)(1). According to the State, these facts included defendant's statements that he set up the drug deal, saw the gun that was used during the assault and robbery, was present at the scene, and lost his hat at the place where the assault and robbery took place. The trial court granted the motion, and this Court accepted the State's appeal.

¶ 10. On appeal, the State argues that the court's order was error because the court erroneously considered the detective's

subjective belief in defendant's guilt and defendant's subjective characteristics like his age. The State argues there was no custody because a reasonable person would have felt free to leave. Our review of the granting of a motion to suppress involves a two-step analysis. *State v. Lawrence*, 2003 VT 68, ¶ 8, 175 Vt. 600, 834 A.2d 10 (mem.). We defer to the trial court's factual findings and will affirm them unless clearly erroneous. *Id.* The underlying legal issue, such as whether there was a custodial interrogation, is a legal question and our review "is plenary and nondeferential." *State v. Sole*, 2009 VT 24, ¶ 17, 185 Vt. 504, 974 A.2d 587; see *Thompson v. Keohane*, 516 U.S. 99, 112-13 (1995) (holding that question of whether suspect is in custody for *Miranda* purposes is "a mixed question of law and fact," qualifying for independent review (quotation marks omitted)).

■ ■ ¶ 11. In the landmark decision of *Miranda v. Arizona*, the U.S. Supreme Court held that to adequately protect Fifth Amendment rights police are required to advise suspects of their rights to remain silent and to have an attorney present prior to any custodial interrogation.[1] 384 U.S. at 444-45. "Suspects not in custody are not entitled to *Miranda* warnings." *State v. Garbutt*, 173 Vt. 277, 282, 790 A.2d 444, 448 (2001). The custody determination involves an objective test based on " 'the totality of the circumstances.' " *State v. Oney*, 2009 VT 116, ¶ 10, 187 Vt. 56, 989 A.2d 995 (quoting *State v. Willis*, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985)). The key inquiry is whether " 'a reasonable person would believe he or she were free to leave or to refuse to answer police questioning.' " *Id.* (quoting *Willis*, 145 Vt. at 475, 494 A.2d at 117). In the absence of a formal arrest, the critical question is whether law enforcement officials acted or spoke in a manner that conveyed the message that they would not permit the individual to leave. *United States v. Ali*, 86 F.3d 275, 276 (2d Cir. 1996).

---

[1] On appeal, defendant argues that the trial court's decision was grounded in both the Vermont and Federal Constitutions. Although defendant cited the Vermont Constitution in his motion to suppress, he did not argue that it provided greater protection than the Fifth Amendment. Further, the trial court's decision did not expressly base its ruling on the Vermont Constitution. On appeal, neither party argues that the result would be different under the state constitutional provision. We have held that Article 10's protection against self-incrimination is "synonymous" with the privilege contained in the Fifth Amendment. *State v. Rheaume*, 2004 VT 35, ¶ 18, 176 Vt. 413, 853 A.2d 1259. Thus, we consider the issue under federal law and do not separately address the issue under the Vermont Constitution.

154

■ ¶ 12. In *State v. Muntean*, 2010 VT 88, ¶ 19, 189 Vt. 50, 12 A.3d 518, we identified several factors to consider in making the custody determination. These include: (1) the location of the interview; (2) the interviewer's communication to the suspect of his belief in the suspect's guilt; (3) whether the suspect arrives at the interview voluntarily; and (4) "whether the police told the suspect that he was free to terminate the interview at any point and leave." *Muntean* listed other indicators of custody including:

> the extent to which the suspect was confronted with evidence of guilt; whether and to what degree the suspect's freedom of movement was restrained; whether the police used deceptive techniques in conducting the interview; the degree to which the suspect was isolated from the outside world; the duration of the interview; whether the police officers were armed; and the number of police officers present during the interview.

*Id.* We cautioned that the list was not exhaustive and that the totality of the circumstances should be considered.

■ ¶ 13. Applying this analysis to the unchallenged facts, we conclude that police engaged in a custodial interview of defendant without providing the necessary *Miranda* warnings.

■ ¶ 14. We begin with the most important factor — whether police informed defendant that he was free to leave. "Numerous courts have held that such disclosure is significant in determining whether a reasonable person would have felt at liberty to terminate a police interview." *Muntean*, 2010 VT 88, ¶ 25 (citing cases); see *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003) ("[A] statement by a law enforcement officer to a suspect that he is not under arrest is an important part of the analysis of whether the suspect was 'in custody.'" (quoting *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998)). In *Muntean*, we concluded that the defendant was in a custodial situation in large part because police did not "expressly indicate[] that defendant was free to terminate the interview and leave at will." 2010 VT 88, ¶ 27. This factor was pivotal, distinguishing *Muntean* from other cases where we had concluded the suspect was not in a custodial situation. *Id.* A reasonable person's belief about whether the person is free to leave is necessarily influenced by the communication from police about the extent of the person's freedom. *United States v. Griffin*,

922 F.2d 1343, 1350 (8th Cir. 1990) ("[T]he absence of police advisement that the suspect is not under formal arrest, or that the suspect is at liberty to decline to answer questions, has been identified as an important indicium of the existence of a custodial setting."). That is why custody is usually not found when police assure a defendant that he is not under arrest, and is free to terminate the questioning and leave. See, e.g., *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (concluding that defendant, who was questioned at police station, was not in custody where officer informed him that he was not under arrest and was free to leave at end of interview); *United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009) (noting that circuit has "consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time"); *Oney*, 2009 VT 116, ¶ 16 (concluding there was no custody where defendant was repeatedly told he was free to leave); *State v. Pontbriand*, 2005 VT 20, ¶ 19, 178 Vt. 120, 878 A.2d 227 (holding defendant was not in custody where officers multiple times informed defendant he was not under arrest and was not required to speak with them). Here, officers did not inform defendant he was free to leave or that he was not under arrest. This fact strongly indicates a custodial setting.

¶ 15. In addition, the content of the questioning created a custodial atmosphere because throughout the interview the detectives repeatedly confronted defendant with evidence of his guilt. See *Muntean*, 2010 VT 88, ¶ 19 (listing as factor "extent to which the suspect was confronted with evidence of guilt"). The detective who testified at the suppression hearing stated that he believed there was probable cause to arrest defendant prior to the interview and that he intended to arrest defendant at that time. The detectives communicated this belief to defendant explaining they knew he was involved in the crime and confronting defendant with the existing evidence they had of his guilt. They emphasized that they had spoken with the victim and his friend, had interviewed witnesses in the neighborhood, and had identified defendant as one of the suspects. They also stated they knew there was a gun involved. They communicated that defendant could be arrested for armed robbery — a serious offense — based on that evidence. In fact, they did arrest defendant at the close of the interview. See *Griffin*, 922 F.2d at 1355 (explaining that arrest at termination of interview is "objective evidence which tends to

support the reasonableness of [the defendant's] subjective belief that he was in custody from the inception of the encounter and that his arrest was imminent").

¶ 16. This type of repeated accusatory questioning created the kind of " 'coercive environment' " indicative of police custody. *Muntean*, 2010 VT 88, ¶ 28 (quoting *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)). While the detective's subjective belief in defendant's guilt is not necessarily relevant, it becomes so when communicated to the suspect because it affects the person's objective belief in whether he or she is free to leave. *Garbutt*, 173 Vt. at 282, 790 A.2d at 448; see *Griffin*, 922 F.2d at 1348 (explaining that fact that individual is focus of investigation is relevant to extent communicated because it contributes to objective sense of custody). "A reasonable person would not feel at liberty to terminate a police interview after being confronted with such evidence, as a 'reasonable person understands that the police ordinarily will not set free a suspect when there is evidence strongly suggesting that the person is guilty of a serious crime.' " *Muntean*, 2010 VT 88, ¶ 28 (quoting *State v. Pitts*, 936 So. 2d 1111, 1128 (Fla. Dist. Ct. App. 2006)). Here, from the outset, the police presented defendant with evidence that: defendant was present during the drug deal and the robbery; a gun was used in the crime; and defendant could be arrested for his involvement.

¶ 17. Finally, other aspects of the questioning are indicative of a police-dominated atmosphere. Defendant did not voluntarily initiate contact with police, but spoke with the detectives after they sought him out, waited for him to come home, and placed him inside a police car. Inside the car, defendant was in a small space with two officers in close proximity, who both questioned him at length for an hour. All of these facts — the initiation of contact by police, the location, the number of officers, and the length of the interview—are indicia of custody.

¶ 18. The State argues that this case is analogous to *State v. Comes* where this Court concluded the defendant was not in police custody when he was interrogated in a police cruiser. 144 Vt. 103, 107, 472 A.2d 1253, 1255 (1984). In *Comes*, police were investigating a burglary and approached the defendant in a restaurant. The defendant voluntarily agreed to talk with police outside where it would be more private. Since it was a cold winter day, they got into the police cruiser. Only a few minutes elapsed before the

defendant admitted he was involved in the burglary after police noted the defendant's shoes were similar to the footprints found at the scene of the burglary. Following the defendant's admission, police advised the defendant of his *Miranda* rights.

¶ 19. Questioning of a suspect in a cruiser will not always support a finding of custody. *Id.* In this case, however, the facts describe a situation in which defendant would not have felt free to leave. Here, two detectives came to defendant's house and asked him to get in the police cruiser. They deliberately chose to conduct the interview in the cruiser, rather than in the home, thus separating defendant from the familiar setting of his home and his family. See *Griffin*, 922 F.2d at 1352 (explaining that police domination occurs when suspect is removed from "presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements"); cf. *Pontbriand*, 2005 VT 20, ¶ 16 (concluding that suspect was not in custody in part based on fact that officers made no effort to isolate suspect from others). During the interview, police directed defendant not to use his cell phone, further cutting him off from contact with others and asserting their authority. Whereas in *Comes* police merely commented on the fact that the suspect's shoes were similar to footprints found at the scene, here defendant was confronted with existing evidence of his personal involvement in the crime, including eye witness identification and the fact that he could be arrested based on that evidence. These facts distinguish *Comes* and support a finding of custody.

¶ 20. The State also argues that the trial court erroneously considered the officer's subjective belief in defendant's guilt and defendant's age of nineteen years, a subjective characteristic. The State contends that since defendant was an adult his age was irrelevant because the proper inquiry is whether a reasonable person would believe he or she was free to leave. See *Garbutt*, 173 Vt. at 282, 790 A.2d at 448 (explaining custody is an objective inquiry). We do not reach this question because we do not rely on defendant's young age in our analysis of whether defendant was in custody. As to the consideration of the officer's subjective belief in defendant's guilt, we conclude there was no error. This belief was relevant because it was communicated to defendant during the questioning.

¶ 21. Finally, the State argues in the alternative that even if defendant was in custody later in the interview, custody did not arise until the detectives began to confront defendant with evidence of his guilt, and that his incriminating statements made early in the interview should not be suppressed. We are not persuaded. From the outset of the questioning, there were indicia of custody and police dominance over defendant. He was directed into the cruiser; not informed that he was free to leave or to terminate the interview; told that they had gathered information/ evidence from the victim of the assault, his friend, and other witnesses; and told that the police already knew what had happened in the assault. Certainly, later in the interview the detectives more precisely laid out the evidence against defendant and concretely told defendant that there was sufficient evidence to arrest him. We cannot say, however, that under the totality of the circumstances, defendant's statements even at the beginning of the interview were made in response to mere questioning rather than the product of a custodial interrogation.

¶ 22. We conclude that defendant was in custody and entitled to *Miranda* warnings, and because such warnings were not provided, defendant's statements made during the March interview must be suppressed.

*Affirmed.*

¶ 23. **Burgess, J.,** concurring in part and dissenting in part. I agree that *Miranda* warnings were required when the detectives made it reasonably clear to defendant that he could be arrested and charged with armed robbery. I respectfully dissent, however, from the majority's conclusion that the warnings were required at the outset of the questioning. Accordingly, I would reverse that portion of the trial court's decision suppressing defendant's earliest acknowledgment that a "fake" gun was used in connection with the robbery, together with whatever other admissions he may have made before the officers asserted he was subject to felony arrest.

¶ 24. Neither facts nor law support the trial court's and majority's view that custody occurred at the onset of questioning. Two plainclothes detectives arrived at defendant's home in an unmarked car and told him that they would like to talk to him. The detectives were invited into the house, but asked defendant if he would mind talking to them "out here for a little bit, so we

have a little privacy," away from defendant's mother. When defendant stepped outside, the officers asked if he would mind sitting in their car. Defendant agreed. At the start of the questioning, defendant professed not to know why the detectives wanted to talk to him. The detectives explained they were investigating a fight reported two nights earlier and wanted to give defendant an opportunity to give his side of the story. They told him that they had spoken to the putative victims, as well as neighbors and other witnesses about the incident.

¶ 25. At this point, there was no objective indication of custodial interrogation to trigger *Miranda* warnings. The subjective design of the detectives is irrelevant. *State v. Willis*, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985). Defendant was not restrained. Assuming defendant could even be characterized as detained, police questioning during a brief investigative detention on a public roadway is not inherently "custodial" for *Miranda* purposes. *State v. Boardman*, 148 Vt. 229, 231-32, 531 A.2d 599, 601 (1987). Nothing in the record suggests that defendant was coerced to get into the detectives' car, and it is long settled that questioning in a police car does not necessarily amount to custody. *State v. Comes*, 144 Vt. 103, 106-07, 472 A.2d 1253, 1255-56 (1984) (finding no custody when suspect voluntarily agreed to questioning in police car for privacy on cold day and without any physical restraint).

¶ 26. The detectives began questioning in the police car by asking defendant how he and one of the named victims had first come into contact with each other. When defendant gave vague and inconsistent answers, the detectives explained that they already had the answers to some of the questions they were asking and that they knew "for the most part what happened." The detectives then asked defendant: "Where's the gun?" When defendant professed not to know anything, the detectives noted that a gun can be dangerous and asked if the gun was real or a fake. Defendant told them that it was a fake. He explained that it was "plastic," but that he did not know where it was.

¶ 27. As of the time defendant made these last statements, approximately five minutes into the questioning, there was still no basis upon which to conclude that he was under actual or de facto arrest. The majority adopts the trial court's findings underlying its determination of police-dominated custody, but those findings are either unsupported by the evidence — at least prior to defendant's admissions about the gun — or are legally irrelevant.

The trial court relied on the detectives' probable cause and undeclared intention to arrest defendant, when it is settled that the subjective knowledge and intent of police are irrelevant to a defendant's perception of custody. *Willis*, 145 Vt. at 473, 494 A.2d at 115-16. The court cited defendant's age of nineteen, but an adult's age alone is not objectively determinative of a reasonable person's perception of arrest. See *State v. Oney*, 2009 VT 116, ¶ 10, 187 Vt. 56, 989 A.2d 995 (requiring objective inquiry). The court found the detectives accused defendant of assault and robbery, but that did not actually occur until *after* his admissions about the gun. The trial court's findings could be understood to state that the detectives confronted defendant with the fact that they had all the identifying information linking him to the robbery, but such a finding is unsupported by any evidence *before* defendant's admissions about the gun. The court also found all of the evidence obtained against defendant was garnered over the course of an hour's interrogation, when his gun admission occurred within his first few minutes in the car.

¶ 28. The majority adopts these findings, notwithstanding the undisputed contrary record evidence, and adds that the physical conditions of interrogation in a police car support the notion of custodial interrogation, even though it is equally settled that questioning in a police cruiser does not, in and of itself, amount to custodial interrogation. *State v. Lancto*, 155 Vt. 168, 171, 582 A.2d 448, 449 (1990); see *State v. McElreavy*, 157 Vt. 18, 24-25, 595 A.2d 1332, 1335-36 (1991) (refusing to suppress statements made to police during interview in police cruiser). Considered in the aggregate, up to when he was asked about and admitted knowledge of the gun, defendant agreed to enter the police car, was not yet accused, was not confronted with evidence, and was not told he could be arrested — all in the space of about five minutes. Nevertheless, the majority appears to hold that defendant perceived himself in custody the moment he entered the police car because the detectives told him that they already knew what had happened and did not affirmatively tell him that he was free to leave. This is not the test for custody under *Miranda*.

¶ 29. The majority makes much of the fact that the officers did not explicitly tell defendant that he was free to end the questioning and leave at any time, but neither did they tell him he was not free to end the questioning and leave. As noted in a recent Vermont federal case, the United States Court of Appeals for the

Second Circuit has emphasized that, absent an actual arrest, an interrogation is not custodial " 'unless the authorities affirmatively convey the message that the defendant is *not* free to leave.' " *United States v. Ramos*, No. 1:11-cr-111, 2012 WL 1854747, at *13 (D. Vt. May 21, 2012) (quoting *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) (emphasis added)). No such message was conveyed to defendant in this case before his admission about the gun.

¶ 30. In any event, feeling "free to leave" is not the ultimate standard for determining custody under *Miranda*. Persons temporarily detained for investigation, and who would not reasonably feel free to walk away from the police, " 'are not in custody for the purposes of *Miranda* absent some showing that they were subjected to restraints comparable to those associated with a formal arrest.' " *State v. Gemler*, 2004 VT 3, ¶ 8, 176 Vt. 257, 844 A.2d 757 (quoting *Lancto*, 155 Vt. at 171, 582 A.2d at 449).

¶ 31. The United States Supreme Court has never made "free-to-leave" the only factor in determining whether a person was in custody requiring *Miranda* warnings. "The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody." *United States v. Newton*, 369 F.3d 659, 670 (2d Cir.), *cert. denied*, 543 U.S. 947 (2004).[2] "The 'ultimate inquiry' for determining *Miranda* custody . . . is that articulated by the Supreme Court in *California v. Beheler*: 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotations omitted)); see *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (stating that *Miranda* warnings are not required merely because there are some coercive aspects to police questioning or because suspect is questioned at police station, but rather "only where there has been such a restriction on a person's freedom as to render him 'in custody' "); *Oney*, 2009 VT 116, ¶ 16 ("Custody

---

[2] "[A] free-to-leave inquiry reveals only whether the person questioned was seized." *Newton*, 369 F.3d at 672. "Because seizure is a necessary prerequisite to *Miranda*, . . . it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue." *Id.* If the answer to the "free-to-leave" inquiry is no, the analysis is not over because "not every seizure constitutes custody for purposes of *Miranda*." *Id.*; see *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) ("[I]t is not enough to say a person has been *arrested* simply because, due to police action, he reasonably believes he is not free to leave.").

is not established simply because the questioning takes place in a police station or because the questioned person is one whom the police suspect.").

¶ 32. "In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672. "Only if the answer to this second question is yes was the person 'in custody for practical purposes,' and 'entitled to the full panoply of protections prescribed by *Miranda*.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotations omitted)); *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (highlighting free-to-leave inquiry as essential component of "in custody" determination, but reiterating that "ultimate inquiry" is arrest or arrest-like restraint test established in *Miranda* and *Beheler*).[3]

¶ 33. The United States Supreme Court in *Berkemer* "identified two factors as particularly relevant to determining whether a lawful investigatory stop involves restraints generally associated with a formal arrest." *Newton*, 369 F.3d at 675. The first is whether a reasonable person in the same situation as the defendant would have understood his detention to be "temporary and brief" and the second is whether such a person would feel that he was "completely at the mercy of the police." *Berkemer*, 468 U.S. at 437-38. Here, at least for the first few minutes of the police questioning, a person in defendant's position would have no reason to believe that he was subject to constraints equivalent to a formal arrest or that his detention was not going to be temporary or that he was at the complete mercy of the detectives — at least according to our case law.

---

[3] Perhaps the best illustration of how the two questions differ is a situation where police restrict an individual's movements while conducting a vehicle search or executing a search warrant. Reasonable people in such a situation would understand they were not at liberty to leave, but would have no reason to believe they were under actual arrest. Cf. *United States v. Groezinger*, 625 F. Supp. 2d 145, 158-59 (S.D.N.Y. 2009) (concluding that reasonable person whose movements in his home were restricted while police conducted search would not have felt free to leave but neither would have understood his freedom to be curtailed to degree associated with formal arrest); *State v. Wilkins*, No. 20152, 2004 WL 1662101, at *5 (Ohio Ct. App. July 23, 2004) (concluding that reasonable person invited to sit in police cruiser out of rain while police conducted canine search of his vehicle was not entitled to *Miranda* warnings).

¶ 34. Perhaps the closest Vermont case is *State v. Comes*, 144 Vt. 103, 472 A.2d 1253, which the majority strains to distinguish, to no avail. In *Comes*, we rejected the defendant's argument that *Miranda* warnings were required under remarkably similar facts where detectives investigating a reported burglary of a gas station noticed particular shoeprints on a door that had been kicked open. The detectives confronted their suspect, the defendant, at a restaurant, and he agreed to speak to them. The detectives and the defendant left the restaurant and, it being a cold day, entered the police cruiser. The officers told the defendant they were investigating a gas station burglary, and one of the officers commented that defendant's shoe soles appeared to match foot-prints found at the burglary scene. The defendant then admitted involvement in the burglary. At that point, the officers advised the defendant of his *Miranda* rights.

¶ 35. Noting that the defendant voluntarily agreed to speak to the officers outside, that it was logical for them to talk in the police cruiser on a cold winter day, that the defendant was not handcuffed, and that only a few minutes had elapsed before the defendant's admission of guilt, we held that "[t]he trial court could properly have found that until the defendant made his admission, the officers were merely questioning the defendant and the defendant's freedom to leave was not restricted in any way." *Id.* at 107, 472 A.2d at 1256. We emphasized in *Comes* that police officers are not required to give *Miranda* warnings to everyone they question, including those that they suspect of having com-mitted a crime. *Id.*

¶ 36. The majority attempts to distinguish *Comes* by noting that while police in that case "merely commented on the fact that the suspect's shoes were similar to footprints found at the scene, here defendant was confronted with existing evidence of his personal involvement in the crime, including eye witness identification and the fact that he could be arrested based on that evidence." *Ante*, ¶ 19. The majority is incorrect. The interrogation transcript in the instant case reveals that before defendant indicated the gun used in the incident was fake, the officers told him only that they had spoken to the witnesses, were aware of the "fight," and knew who was there, where it happened, and "how it went down." In an obvious effort to get defendant to talk, the detectives expressed their interest in getting his side of the story, but advised him that they had the means to tell how honest he was being, that they

wanted to see if he would accept "some responsibility," and that they were seeking his "cooperation." Defendant was confronted with no evidence of his involvement. Until the blunt question of "where's the gun," the officers' patter was all general and open-ended cajolery. It was not until *after* defendant revealed his knowledge of the gun that the officers told him to stop playing with his cell phone and informed him that he could be arrested and charged. *Comes* is practically indistinguishable.

¶ 37. Nor were the initial circumstances of the questioning in this case any more accusatory or oppressive than the police car interrogation found to be noncustodial in *Lancto*, 155 Vt. 168, 582 A.2d 448. In *Lancto*, an injured suspect walking away from a crashed automobile was stopped by the responding trooper who questioned his veracity when he claimed to have been in a fight rather than an accident and told him to have a seat in the cruiser. Detecting the odor of intoxicants, the trooper questioned the suspect about drinking preliminary to DUI processing and without the benefit of *Miranda* warnings. We upheld the trial court's refusal to find that those circumstances would lead a reasonable person to believe he or she was not "free to leave or to refuse to answer questions." *Id.* at 171, 582 A.2d at 449.

¶ 38. The situation here is similar. There is no finding that defendant's agreement to speak to the detectives in private in their unmarked car in a public place outside his home was involuntary. Within minutes of speaking to the officers, before they made it clear to him that they intended to arrest him, defendant made statements acknowledging his awareness of the gun, thus implying he was at the scene of the crime. The fact that the officers informed defendant at the outset of the questioning that they had spoken to witnesses and had a good idea of what happened did not amount to a custodial situation requiring *Miranda* warnings. See *State v. Pontbriand*, 2005 VT 20, ¶ 18, 178 Vt. 120, 878 A.2d 227 ("The investigating officers undoubtedly made it clear to Pontbriand that they thought he had committed a crime, but this is not enough to establish custody for *Miranda* purposes.").

¶ 39. I agree, however, that when the detectives asserted control by restricting defendant's use of his cell phone and informing defendant that they had more than enough evidence to charge him, their continued questioning required *Miranda* warnings, particularly in light of defendant's earlier admissions. Cf. *Oney,*

2009 VT 116, ¶14 (acknowledging that "once a suspect confesses to committing a serious criminal act, this fact is significant" in evaluating whether *Miranda* warnings are required); *State v. Sole*, 2009 VT 24, ¶19, 185 Vt. 504, 974 A.2d 587 (concluding that *Miranda* warnings were required once conversation turned from traffic stop to trooper's reasonable suspicion of drug use and trooper indicated that defendant was not leaving until drug issue was resolved). It was then reasonable for defendant to perceive himself as destined to remain in the company of the detectives after being told, essentially, that he could be arrested and charged for armed robbery.

¶ 40. Accordingly, *Miranda* warnings were necessary upon the detectives' assertion of control over defendant by curtailing his cell phone and advising they could arrest him, so that his statements past that point must be suppressed. I must respectfully dissent, however, from the majority's position that *Miranda* warnings were required before any facts objectively suggested that not only was defendant not immediately free to go, but that he was *also* likely to be kept under formal arrest.

¶ 41. I am authorized to state that Chief Justice Reiber joins this concurrence and dissent.