Skoglund, J.,
¶ 46. dissenting. I dissent. This was not a typical, routine interview of a parolee or furloughee. This was a special visit to respond to an allegation that defendant had committed a crime. The totality of the circumstances shows that defendant was “in custody” when he made involuntary, incriminatory statements to his supervising Department of Corrections (DOC) officer, and therefore his statements should be suppressed. I would affirm the trial court’s decision.
¶ 47. Under the Fifth Amendment to the U.S. Constitution, an individual is privileged “not to answer official questions put to him . . . where the answers might incriminate him in future criminal proceedings.” Minnesota v. Murphy, 465 U.S. 420, 426 (1984) (quotation omitted); U.S. Const. amend. V (stating that no person “shall be compelled in any Criminal Case to be a witness against himself’). “A defendant does not lose this protection by reason of his conviction of a crime.” Murphy, 465 U.S. at 426. Thus, even if a defendant is “on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted.” Id. And, just to be clear, defendant was not on probation, he was under the “highest level” of furlough supervision. Furlough “shall in no way be interpreted as a probation or parole of the offender.” 28 V.S.A. § 808(c).
¶ 48. Although generally an individual must assert his or her Fifth Amendment right to be entitled to its protection, an exception is made for statements “obtained during custodial interrogation.” Murphy, 465 U.S. at 430; Miranda v. Arizona, 384 U.S. 436, 444 (1966) (explaining that “custodial interrogation” means “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way”). This is because “the custodial setting is thought to contain ‘inherently compelling pressures which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so *411 freely.’ ” Murphy, 465 U.S. at 430 (quoting Miranda, 384 U.S. at 467). Thus, “[t]o dissipate the overbearing compulsion caused by isolation of a suspect in police custody,” law enforcement officers must warn individuals of their right to remain silent and warn them of the consequences of failing to assert such right before engaging in any custodial interrogation. Id. (quotation and alterations omitted). If the warnings are not provided, any incriminatory statements must be suppressed. Id. (explaining that courts must exclude “incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it”).
¶ 49. The Supreme Court has identified a two-part test to determine if an individual is “in custody” for Miranda purposes. Howes v. Fields, 565 U.S. 499, 509, 132 S. Ct. 1181, 1189 (2012). Courts must first consider if, “in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.” Id. (quotations omitted). This requires an examination of “all of the circumstances surrounding the interrogation,” including “the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.” Id. (quotations omitted). Because “[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda,” courts must also ascertain if “the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda.” Id. at 509, 132 S. Ct. at 1189-90.
¶ 50. Here, because defendant was on furlough status, he could be returned to jail without any evaluation by a court of the reasons for his reincarceration. In State v. Bogert this Court recognized that “the restraints on defendant’s individual liberty associated with his conditional-reentry status are significant.” 2013 VT 13A, ¶ 24, 197 Vt. 610, 109 A.3d 883. According to the testimony of his supervising correctional officer, the officer could enter the defendant’s apartment without permission and could search it without any warrant. And, he could put defendant in custody while searching the residence. As an example of this, he testified that he could order a person on furlough to “stay seated in a primary location so we can conduct the search.”
*412 ¶ 51. In Murphy the Supreme Court concluded that a probationer was not “in custody” during a “probation interview, arranged by appointment at a mutually convenient time” and therefore reversed the decision of the Minnesota Supreme Court that had suppressed Murphy’s incriminating statements to his probation officer that implicated him in another crime. 465 U.S. at 433. In Murphy the probation officer wrote to Murphy and asked him to contact her to discuss a treatment plan for the remainder of his probationary period. In actuality, the meeting was in direct response to her learning that Murphy had admitted committing a rape and murder to his counselor in the required program for sexual offenders, and she intended to report any incriminating statements that Murphy made during the interview to police. Id. at 422-23. Murphy admitted to the crimes during the interview. Id. at 423. Murphy was not detained at the end of the interview. The probation officer informed the police of Murphy’s admissions, and he was subsequently indicted for first-degree murder.
¶ 52. As indicated, the Supreme Court determined that Murphy was not in custody during the probation meeting. It found that the meeting did not convey to Murphy “a message that he has no choice but to submit to the officers’ will and to confess,” nor did it thrust him into “an unfamiliar atmosphere or an interrogation environment created for no purpose other than to subjugate the individual to the will of his examiner.” Id. at 433 (quotation and alterations omitted). The Court explained that Murphy met regularly with his probation officer at her office, and that these regular meetings “should have served to familiarize him with her and her office and to insulate him from psychological intimidation that might overbear his desire to claim the [Fifth Amendment] privilege.” Id.
¶ 53. While the majority believes ‘Murphy answers much of defendant’s argument on the special need for Miranda warnings in probation officer interview cases where the State seeks to admit the result of that interview in a separate criminal case,” ante, ¶ 15, reliance on Murphy cannot decide the issue in this case; too many factors distinguish Murphy from this case. Again, defendant here was on furlough, not probation. And, while the Supreme Court found no custodial setting and no compulsion involved in Murphy’s questioning and, thus, did not suppress his statements, it acknowledged: “The result may be different if the questions put to the probationer, however relevant to his probationary status, *413 call for answers that would incriminate him in a pending or later criminal prosecution.” Murphy, 465 U.S. at 435.
¶ 54. Defendant here was in a custodial situation for Miranda purposes. His supervisor said as much when he testified that he directed defendant to sit on the couch while a search was conducted and that he did not leave defendant alone until the other correctional officer came downstairs to watch over defendant. Defendant understood that his furlough status could be immediately revoked if he failed to answer his DOC supervisor’s questions without the need for the supervisor to resort to the procedures offered for a probationer when charged with a violation of probation conditions. He had already received four graduated sanctions for prior incidents, with one resulting in incarceration. While the questioning occurred in defendant’s home and he knew his supervising officer well, it is disingenuous to label this visit as a typical “probation interview, arranged by appointment at a mutually convenient time” as in Murphy. Id. at 433. The record shows that defendant’s supervising officer, and a second DOC officer, went to defendant’s home specifically in response to a report that defendant was suspected of committing a new crime.
¶ 55. This record compels a finding of custody. It is significant that defendant did not “arrive[ ] at the interview voluntarily,” or leave “by his . . . own free will.” State v. Muntean, 2010 VT 88, ¶ 19, 189 Vt. 50, 12 A.3d 518. Moreover, the focus of the interview was not on the terms of defendant’s furlough agreement but rather on investigating suspicions of involvement in new criminal acts. Cf. State v. Steinhour, 158 Vt. 299, 302, 607 A.2d 888, 890 (1992) (“The purpose of a probation officer’s questions about the probationer’s behavior related to and affecting his probation is ordinarily not aimed at ferreting out evidence to support an additional criminal prosecution.”). While the interview occurred in defendant’s home, this is not by itself determinative of the totality-of-the-circumstances inquiry. Muntean, 2010 VT 88, ¶ 19. As one court has explained, “[questioning which occurs in the suspect’s own home may provide a margin of comfort, but ... the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting.” United States v. Griffin, 922 F.2d 1343, 1354-55 (8th Cir. 1990).
¶ 56. During their conversation, the officers never told defendant that he did not have to answer their questions or that he was free *414 to terminate the interview. Like other courts, we have found this type of disclosure “significant in determining whether a reasonable person would have felt at liberty to terminate a police interview.” Muntean, 2010 VT 88, ¶ 25 (citing cases). Indeed, we found the absence of such a statement pivotal in both Muntean and State v. Hieu Tran, 2012 VT 104, ¶ 14, 193 Vt. 148, 71 A.3d 1201. In this case, defendant could not have reasonably believed he could have terminated the interview.
¶ 57. While the conversation here may have been short, the questions were not open-ended as the majority posits. Ante, ¶ 29. The supervising officer repeatedly asked defendant if he had anything to report, conveying the officer’s belief that there had been slippage on defendant’s part. Then, defendant was confronted with evidence of a new crime by the discovery of drilled holes in defendant’s bedroom that looked into the adjoining unit. Prior to that announced discovery, defendant said only that he had “screwed up.” The confrontation of defendant with evidence suggesting his guilt of a serious crime contributed significantly to the coercive atmosphere. See, e.g., Hieu Tran, 2012 VT 104, ¶ 15 (concluding that “the content of the [detectives’] questioning created a custodial atmosphere because throughout the interview the detectives repeatedly confronted defendant with evidence of his guilt”); Muntean, 2010 VT 88, ¶ 29 (finding it significant to custody analysis that “during the interview defendant was accused of committing a serious crime and confronted with evidence of his guilt”). As explained in Muntean, a reasonable person confronted with such evidence “would not feel at liberty to terminate a police interview” because “a reasonable person understands that the police ordinarily will not set free a suspect when there is evidence strongly suggesting that the person is guilty of a serious crime.” Id. ¶ 28 (quotation omitted).
¶ 58. This leads to another important distinction between the instant case and Murphy. The probationer in Murphy was free to leave the probation interview. The Supreme Court emphasized that Murphy was free to leave during the interview and did in fact leave the interview without being arrested despite confessing to rape and murder. Murphy, 465 U.S. at 433, 434 n.5. This was a significant part of the Court’s calculus. Unlike Murphy, defendant was not free to leave the interview “by his . . . own free will” even before he admitted drilling the holes and was handcuffed behind his back. Muntean, 2010 VT 88, ¶ 19; see also Howes, 565 U.S. at *415 509, 132 S. Ct. at 1189 (stating that one relevant factor in custody analysis is “the release of the interviewee at the end of the questioning”); Hieu Tran, 2012 VT 104, ¶ 15 (finding it significant in custody analysis that officers repeatedly confronted defendant with evidence of his guilt, communicated that defendant could be arrested for a serious offense based on that evidence, and did in fact arrest defendant at the close of the interview).
¶ 59. Again, defendant was not on probation. He was on furlough. And, while his furlough status alone is not sufficient basis to require a Miranda, warning, see State v. LeClaire, 2003 VT 4, ¶ 16, 175 Vt. 52, 819 A.2d 719, the conditions of his furlough are strong evidence that he was not free to leave when confronted by his probation officer. In fact, he was directed to stay on his couch, an action the supervising officer testified was a means of putting a person on furlough “in custody” for safety purposes while conducting a search. No reasonable person in defendant’s position would have felt free to terminate the interview. Here, “the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda.” Howes, 565 U.S. at 509, 132 S. Ct. at 1189-90.
¶ 60. Other courts have reached similar conclusions in cases that involved alleged “parole interviews." See Commonwealth v. Cooley, 118 A.3d 370, 379-80 (Pa. 2015) (concluding that “no mere parole interview” occurred where parolee was immediately handcuffed after voluntarily appearing at parole office, accused of crimes for which he was not on parole, “there was no ‘interview’ or dialogue related to the conditions of his parole or parole violations,” he was not told that he was not under arrest or that he was being handcuffed pursuant to routine policy, but was instead informed that he was being investigated for new crimes, and agents’ interrogation and search of parolee’s home “was unquestionably aimed at crimes for which he was not on parole”); see also People v. Coleman, 2015 IL App (4th) 140730, 37 N.E.3d 360 (concluding that parolee was subject to custodial interrogation where parole officer was looking for parolee because of tips indicating parolee had committed new crime, parolee was separated from other people in house, parole agents were armed and parolee was required to cooperate, and parolee was handcuffed and then questioned about an independent crime).
¶ 61. The trial court’s reliance on State v. Steinhour, 158 Vt. 299, 607 A.2d 888 (1992), was not misplaced. While in Steinhour *416 the State sought to use the defendant’s admissions to marijuana use from a probation interview in a violation of probation hearing and not to support a separate criminal charge, the implication of the holding in Steinhour for this case is not a leap. This Court wrote: “if [the] defendant is guilty of conduct which is a violation of probation, ... his answers are relevant and may be used against him in the revocation hearing. That is because defendant is not being compelled to give statements to be used against him in a criminal proceeding.” Id. at 300, 607 A.2d at 889. The Court noted that Steinhour had not been charged criminally with using marijuana and that, if he had been, “a motion to suppress would stand squarely in both the Fifth Amendment and Article 10.” Id. at 301, 607 A.2d at 889. It then quoted from Minnesota v. Murphy:
“There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer’s answers would be deemed compelled and inadmissible in a, criminal ■prosecution”
Id. (emphasis added) (quoting Murphy, 465 U.S. at 435).
¶ 62. This Court supported the Steinhour analysis four years later in State v. Cate, 165 Vt. 404, 683 A.2d 1010 (1996). In Cate, the defendant argued that the probation condition requiring him to admit his guilt as part of sex-offender therapy should be stricken because it violated his Fifth Amendment and Article 10 rights against self-incrimination. We adopted the reasoning of the federal district court in Mace v. Amestoy, which held that when an individual asserts the privilege against self-incrimination, the Fifth Amendment “ ‘privileges [a person] not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings . . . unless and until he is protected at least against the use of his compelled answers.’ ” 765 F. Supp. 847, 850 (D. Vt. 1991) (quoting Murphy, 465 U.S. at 426). We held that a person in a probation setting cannot be forced to incriminate himself without first receiving immunity from criminal prosecution as a result thereof. Cate, 165 Vt. at 415, 683 A.2d at 1018.
*417 ¶ 63. The circumstances surrounding the second set of incriminatory statements to the probation officer are even more indicative of a custody status. I would not remand this question, but rather conclude on these facts that defendant was subjected to custodial interrogation while in the probation office. Defendant was “arrested or detained” at his apartment and placed in handcuffs. It is clear that defendant was not free to leave. See LeClaire, 2003 VT 4, ¶ 16 (“To determine whether an individual is in custody for Miranda purposes, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.” (quotation omitted)); see also Cooley, 118 A.3d at 379 (recognizing that while the use of handcuffs is not dispositive of custody analysis, it is “generally recognized as a hallmark of a formal arrest” (quotation omitted)). Even the State agreed below.
¶ 64. After the investigating police officer provided what the trial court found were inadequate Miranda, warnings at the home, defendant was transported to the DOC office in restraints. He was again interrogated by his supervising DOC officer and admitted the holes in the wall had been made some three months earlier, and that he had seen his minor female neighbor when she was naked or wearing underwear. Defendant’s supervising DOC officer made these further inquiries because he felt that he needed to have full information in making a decision about whether to release defendant. This excuse strains credulity. The confrontation by the supervising officer occurred on April 3. One day later, on April 4, defendant was arraigned on fourteen misdemeanors of voyeurism and stalking. Defendant was not going to be released.
¶ 65. The police officer was told of defendant’s further remarks. When the officer arrived at the DOC office, he did not inform defendant of his Miranda, rights. Defendant then confirmed what he had told his supervising officer. The court found the evidence unclear as to whether defendant remained handcuffed at the DOC office. The State concedes that defendant was not free to leave during his conversation with his supervising DOC officer as “he was being processed to return to jail,” but questions whether defendant was wearing any kind of restraints at that point. Given all of the indicia of custody, we do not need to discern if defendant was actually wearing restraints during his conversation with his supervising DOC officer. Any reasonable person under these circumstances would understand that he or she is in *418 custody, and the circumstances here present all of the indicia of coercion that Miranda warnings are designed to protect against.
¶ 66. The interview was custodial, defendant’s statements were coerced, and they should not be admissible in the criminal proceeding. I would affirm the trial court’s decision, and suppress both sets of defendant’s statements.
¶ 67. I am authorized to state that Justice Robinson joins this dissent.