NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 110

No. 2015-076

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Criminal Division |
| | |
| John Powers | September Term, 2015 |

David A. Howard, J.

Christina Rainville, Bennington County Chief Deputy State's Attorney, Bennington, for
  Plaintiff-Appellant.

Allison N. Fulcher of Martin & Associates, Barre, for Defendant-Appellee.

William H. Sorrell, Attorney General, and John Treadwell, Assistant Attorney General,
  Montpelier, for Amicus Curiae Office of Attorney General.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.    **DOOLEY, J.**   In this interlocutory appeal, the State challenges the trial court's suppression of two sets of statements that defendant made to his probation officer. The trial court determined that suppression was warranted because the probation officer did not provide defendant with the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966). The State argues that Miranda warnings were not required because defendant was not in custody at the time he made his incriminatory statements. We agree with the State with respect to the first set of statements and reverse the decision to suppress those statements; we reverse and remand the trial court's decision with respect to the second set of statements for further findings on the issue of custody and a new decision consistent with this opinion.

¶ 2.    At the time of the alleged offense, defendant was on a community furlough under the supervision of the Vermont Department of Corrections (DOC) following a conviction for a forcible sexual assault on a thirteen-year-old girl.  A probation officer supervised defendant on furlough from 2009 until his arrest in April 2014.  During that period, the officer and defendant met approximately twice a week.  Defendant was on the "highest level of supervision," such that probation officers were permitted to visit his residence at any time and inspect it for any violations of the special restrictions placed on sex offenders.  Prior to this case, the probation officer investigated four alleged probation violations by defendant, including possession of pornography, peering into female neighbors' windows, and staring at nurses at his mother's convalescent center. In response, the probation officer imposed graduated sanctions in three instances and incarceration in one.

¶ 3.    On April 3, 2014, a resident of defendant's apartment building phoned the probation officer to inform him that police officers were at the complex to investigate reports that defendant had drilled holes in a wall to view his teenaged neighbor in her bedroom in her family's apartment.  The probation officer and another community correctional officer with the Bennington office of DOC went to defendant's residence to investigate.  The probation officer carried no weapons; the other community correctional officer carried mace and wrist restraints.  Upon their arrival, the officers observed a police car in front of the apartment next to defendant's unit.  They knocked at defendant's back door.  Defendant answered, and the officers told him they needed to enter the apartment to speak with him.  Once they entered the apartment, the probation officer instructed defendant to sit down on the living room couch and asked the community correctional officer to go upstairs to see if there was any evidence of drilled holes in a wall.  Neither officer placed defendant in restraints.

¶ 4.    Thereafter, the probation officer began to question defendant, asking if anything was going on or if defendant wanted to report something.  The probation officer did not mention the call he had received from defendant's neighbor.  Although defendant "initially acted confused"

2

and appeared "visibly nervous," the probation officer continued to ask if defendant needed to report anything until defendant finally responded "I screwed up; I think I screwed up." At that point, the community correctional officer returned and announced he had found holes in the wall of the upstairs bedroom. The probation officer asked defendant if he had made the holes, and defendant admitted that he had drilled them three days earlier. Defendant also admitted that he had been struggling with fantasies about his teenaged neighbor but denied that he masturbated while viewing her through the hole. The probation officer then went upstairs to view the holes, which had been covered with pictures and stuffed with toilet paper, and confirmed that it was possible to see into the girl's bedroom. After inspecting the holes, the probation officer returned downstairs to inform defendant he would be taken into custody and to place restraints on defendant's wrists. He then went to the apartment of the teenaged neighbor to speak with the police officer present. He informed the police officer of his presence in defendant's apartment and that he had placed defendant in custody. The police officer eventually came into defendant's apartment and took a videotaped confession from him.[1]

¶ 5.     After defendant spoke to the police officer, the probation officer transported defendant to the DOC office for processing, to be held under a charge that his behaviors constituted a violation of his furlough conditions. Defendant remained in wrist restraints until he arrived at the DOC office, at which point he was transferred into shackles and leg restraints. Defendant completed the necessary paperwork, and the probation officer took him outside to have a cigarette in the parking lot. They then returned to the DOC office, where DOC employees were continually coming in and out of the room in order to check schedules and obtain paperwork. The probation officer "started" a second conversation with defendant about the events that had transpired that day. During their conversation, defendant admitted that he had made the holes three months earlier, that he regularly fantasized about his neighbor, that he had seen her naked on three

---

[1] The trial court suppressed this statement, and a later one made to the police officer. The State has not appealed from these suppression decisions, and we do not address them here.

3

occasions and in her underwear over twenty times, and that he had masturbated while watching her. The probation officer estimated that approximately twenty to twenty-five minutes elapsed from the arrival at the DOC office to the conclusion of defendant's second set of statements, with their conversation about the offending behaviors occurring about ten minutes after their arrival. Following this statement, the probation officer called the police officer to come to the DOC office to interrogate defendant.

¶ 6. Defendant was charged with thirteen counts of voyeurism and one count of stalking. After a mistrial, defendant moved to suppress four sets of statements: two to the probation officer and two to the police officer. Following a December 2014 hearing, the court granted the motion. It found that the statements to the probation officer were inadmissible under State v. Steinhour, 158 Vt. 299, 302, 607 A.2d 888, 890 (1992), which it read to preclude the use of statements made by probationers to probation officers in a new criminal proceeding unless Miranda warnings were given. The court also found the statements and admissions to the police officer inadmissible because the officer's recitation of Miranda warnings was "woefully inadequate," rendering defendant's resulting waiver invalid.

¶ 7. This interlocutory appeal on the two sets of statements made to the probation officer followed. The State argues that the court's conclusion that a probation officer is obligated to give Miranda warnings when an interview might result in new criminal charges is legally wrong. It maintains that Miranda does not apply to either probation officer interview because defendant was not in police or coercive custody.

¶ 8. In reviewing a motion to suppress, we uphold the trial court's findings of fact absent clear error; we review the court's legal conclusions de novo. See State v. Simoneau, 2003 VT 83, ¶ 14, 176 Vt. 15, 833 A.2d 1280. In determining whether an individual is in custody for Miranda purposes, the U.S. Supreme Court requires three discrete inquiries: first, an examination of the circumstances surrounding the interrogation, a purely factual inquiry; second, based on the facts found, an inquiry into whether a reasonable person under those circumstances would have felt free

4

to terminate the interview and leave.[2]   In recent cases, the Court added a third inquiry: whether the environment presents "the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes v. Fields, __ U.S. __, __, 132 S. Ct. 1181, 1190 (2012). Whether the facts meet the two latter standards is a question of law, which we review de novo. In re E.W., 2015 VT 7, ¶ 9, 198 Vt. 311, 114 A.3d 112.

¶ 9.    Before embarking on our analysis, we make one general observation. In our review of case law from other jurisdictions, the only decisions from courts throughout the country that have suppressed statements from defendants because a probation officer failed to give Miranda warnings to a defendant prior to the statement reached these decisions in situations where the defendant was incarcerated[3] or handcuffed[4] at the time of the statement. This is true regardless of

---

[2] Neither defendant nor the trial court has advanced any argument that this case would be decided differently under the Vermont Constitution. Consequently, we do not address that argument here.

[3] See, e.g., Bradley v. State, 559 A.2d 1234, 1245-46 (Del. 1989) (finding statements made without Miranda warnings to director of pre-release services at department of corrections in jail regarding possible parole violation were inadmissible in prosecutor's case and deemed subject of custodial interrogation); State v. Roberts, 513 N.E.2d 720, 725 (Ohio 1987) ("[S]tatements by an in-custody probationer [in jail at the time] to his probation officer are inadmissible in a subsequent criminal trial, where prior to questioning, the probation officer failed to advise the probationer of his Miranda rights . . . ."); State v. Sargent, 762 P.2d 1127, 1131-33 (Wash. 1988) (concluding that probation officer's interview of defendant as part of preparation of pre-sentence report, despite being routine post-conviction procedure, necessitated Miranda warnings, where defendant was in jail, officer asked "Did you do it?" and said defendant should "come to the truth" with himself, and officer was undeniably an officer of the state with allegiance due to state, not defendant). Sargent is distinguishable from the present case because in Sargent no probationary relationship existed between the defendant and the officer at the time of the interview. Although the probation department is statutorily required to conduct presentence interviews, that does not mean the kind of rehabilitative relationship evidenced in this case is created—the officer was acting as an information-gatherer for the court, rather than as someone concerned with the defendant's rehabilitation and welfare. See People v. Cortijo, 684 N.Y.S.2d 435, 440 (Sup. Ct. 1998). We note that the holdings in Bradley and Roberts are unlikely to have survived the holding of the U.S. Supreme Court in Howes, __ U.S. at __, 132 S. Ct. at 1189, that the interrogation of an incarcerated prisoner about a separate crime did not require Miranda warnings.

[4] See People v. Coleman, 2015 IL App (4th) 140730, 37 N.E.3d 360; Commonwealth v. Cooley, 118 A.3d 370 (Pa. 2015). These decisions rest on the rationale that the application of handcuffs before the probationer is questioned creates an arrest. There is no handcuffing or other pre-questioning arrest in this case; defendant was handcuffed after he confessed.

whether the defendant was on probation, parole, or furlough, and regardless of the title of the corrections officer who took the statement. It is even true in cases where the statement was taken by a law enforcement officer who acted in concert with the corrections officer. Because the situation in this case is relatively common, there are many decisions that align with our decision here that Miranda warnings were not required. We have listed a representative sample in this footnote.[5]

¶ 10. We begin with the first set of statements to the probation officer taken in defendant's home. As the U.S. Supreme Court recently reaffirmed in Howes, custody refers to a specific set of circumstances that are "thought generally to present a serious danger of coercion." __ U.S. at __, 132 S. Ct. at 1189. The first step of the inquiry is "to ascertain whether, in light of the objective circumstances of the interrogation," a reasonable person would have felt "he or she was not at liberty to terminate the interrogation and leave." Id. (quotations and alteration omitted). Relevant factors include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints, and the release of the interviewee at the end of the interrogation." Id. (citations omitted); see also E.W., 2015 VT 7, ¶ 15; State v. Sullivan, 2013 VT 71, ¶ 29, 194 Vt. 361, 80 A.3d 67; State v. Muntean, 2010 VT 88, ¶ 19, 189 Vt. 50, 12 A.3d 518. The second step is to determine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes, __ U.S. at __, 132 S. Ct. at 1190.

---

[5] United States v. Cranley, 350 F.3d 617 (7th Cir. 2003); Chruby v. Gillis, 54 F. App'x 520 (3d Cir. 2002); United States v. Hines, No. 1:12-cr-00204-JAW, 2013 WL 1149310 (D. Me. Mar. 1, 2013); United States v. Muhammad, 903 F. Supp. 2d 132 (E.D.N.Y. 2012); United States v. Oakes, No. Crim. 00-76-P-C, 2001 WL 30530 (D. Me. Jan. 10, 2001); McAllister v. State, 807 A.2d 1119 (Del. 2002); State v. Christensen, 360 P.3d 348 (Idaho Ct. App. 2015); State v. Schroeder, No. 90,011, 2004 WL 117340 (Kan. Ct. App. Jan. 23, 2004) (nonprecedential); State v. Kittredge, 2014 ME 90, 97 A.3d 106; People v. Elliott, 833 N.W.2d 284 (Mich. 2013); State v. Hedlund, No. A08-0266, 2009 WL 1373670 (Minn. Ct. App. May 19, 2009) (nonprecedential); State v. Hermosillo, 2014-NMCA-102, 336 P.3d 446 (N.M. Ct. App.); State v. Scott, 765 N.E.2d 930 (Ohio Ct. App. 2001).

¶ 11.    The State argues that the issue before us is controlled by the first step in the inquiry and the answer at that step is controlled by the U.S. Supreme Court decision in Minnesota v. Murphy, 465 U.S. 420 (1984).  In Murphy, the defendant was on probation for a sex-related charge, conditions of which included mandatory participation in a treatment program for sexual offenders, periodic reporting to his probation officer, and an obligation to be truthful with the officer "in all matters."  Id. at 422.  During one of his counseling sessions, defendant admitted to a rape and murder seven years earlier, and the counselor informed his probation officer of this admission.  Id. at 423.  The officer wrote to defendant and asked him to contact her to discuss a treatment plan for the rest of the probationary period.  Id.  The officer did not disclose that she intended to confront defendant with his confession at the meeting.  When they met in her office, the officer revealed the information she had learned from the counselor.  Although the defendant became angry and stated he "felt like calling a lawyer," he admitted over the course of the conversation to the rape and murder and tried to persuade the officer further treatment was unnecessary.  Id. at 424.  At the end of the conversation, the officer informed the defendant that she had an obligation to tell the police of the newly disclosed crime.  Id.

¶ 12.    After he was charged with first-degree murder based on his newly disclosed conduct, the defendant sought to suppress his confession on the grounds it was obtained in violation of his rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.  Id. at 425.  Specifically, the defendant argued that he should have been given Miranda warnings before the probation officer questioned him. The Minnesota Supreme Court accepted that argument on the basis that the coercive powers of the probation officer over the probationer made the interrogation the equivalent of custodial interrogation addressed in Miranda such that equivalent warnings were required in the probation interrogation case before the interrogation could be admitted in a criminal case.  State v. Murphy, 324 N.W.2d 340, 344 (Minn. 1982).

¶ 13.    The U.S. Supreme Court rejected the ruling of the Minnesota Supreme Court, ruling that the general obligation to appear before a probation officer and answer truthfully her questions

7

about incriminating conduct—akin to that imposed on grand jury witnesses—did not automatically convert otherwise voluntary statements into compelled ones for purposes of Miranda. Murphy, 465 U.S. at 431. The defendant was free to assert the privilege against self-incrimination and would have suffered no penalty for choosing to do so. Id. at 429. Indeed, there was no direct evidence that the defendant "confessed because he feared his probation would be revoked if he remained silent" and there was nothing in the Minnesota probation conditions to suggest probation was conditional on waiving Fifth Amendment rights regarding future criminal prosecutions. Id. at 437.

¶ 14. The Supreme Court went on to analyze the case under traditional custody factors and concluded that the defendant was not in custody for Miranda purposes since there was no formal arrest and no restraints on his freedom of movement. Id. at 430. The defendant was "not physically restrained" and could have left the probation office, suggesting it would have been unreasonable for him to believe that terminating the meeting would have led to a revocation of probation. Id. at 433. The Court concluded that the psychological pressures stemming from the unfamiliar interrogation environment that Miranda warnings seek to guard against were simply not present, as the defendant had met regularly with his probation officer and was familiar with her and her office. Id.

¶ 15. We agree with the State that Murphy answers much of defendant's argument on the special need for Miranda warnings in probation officer interview cases where the State seeks to admit the result of that interview in a separate criminal case. After Murphy, any such case must be analyzed under traditional factors to determine whether a custodial interrogation, as defined in Miranda has occurred. See Kittredge, 2014 ME 90, ¶¶ 7, 18 (finding no custody where defendant asked to come to probation office and was interrogated there by two uniformed, armed state troopers where: troopers told defendant "he was not under arrest"; defendant "did not manifest any belief that he was not free to leave"; the building was familiar to defendant; there were only two officers present; defendant was not physically restrained; and the interrogation lasted about an

8

hour and occurred in "an unlocked room without any additional coercive conditions"); Elliott, 833 N.W.2d at 293 (concluding that interview by parole officer of incarcerated parolee was not custodial when meeting took place in jail library, lasted between fifteen and twenty-five minutes, and defendant was not physically restrained, even though defendant was not told "he was free to leave the meeting and return to his cell").

¶ 16. Further, we note that the degree of post-conviction, post-incarceration restraint, and a defendant's knowledge of that restraint, have little if anything to do with whether the defendant is in custody for purposes of Miranda requirements unless defendant was actually under arrest. As the Supreme Court explained, the term "in custody" has different meanings in different contexts and is "more narrowly circumscribed" in the context of Miranda. Murphy, 465 U.S. at 430. For purposes of Miranda, custody is present only if a defendant is under formal arrest or under restraint of movement of the degree associated with formal arrest. Id. at 430-31. It is true, as we held in State v. Bogert, that "the restraints on [a] defendant's individual liberty associated with his conditional-reentry status are significant." 2013 VT 13A, ¶ 24, 197 Vt. 610, 109 A.3d 883. These restraints go to the liberty interests of a furloughed prisoner, as we held in Bogert, but do not create custody under Miranda. Indeed, the point of furlough is that the furloughee is not under arrest.

¶ 17. With respect to the assumed knowledge of the defendant, the Murphy Court made a critical distinction:

> [W]e must inquire whether [the defendant's] probation condition merely required him to appear and give testimony about matters relevant to his probationary status or whether they went farther and required him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent. Because we conclude that Minnesota did not attempt to take the extra, impermissible step, we hold that [the defendant's] Fifth Amendment privilege was not self-executing.

465 U.S. at 436.

¶ 18. There is similarly no evidence here that the State would penalize an exercise of a defendant's self-incrimination privilege by revoking his furlough status. As in Murphy, there is

9

no direct evidence that defendant confessed "because he feared that his probation would be revoked if he remained silent." Id. at 437.

¶ 19.   Even this distinction does not end the inquiry.  The Murphy Court went on to hold that even if the defendant had "a belief that his probation might be revoked for exercising the Fifth Amendment privilege, that belief would not have been reasonable." Id. at 438.  This is because decisions of the U.S. Supreme Court prior to Murphy had made clear that a "State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." Id.  For the same reason, such an expectation would not be reasonable in this case; penalizing the exercise of defendant's privilege against self-incrimination would be unconstitutional.

¶ 20.   In Howes, the Court held that the questioning of a prisoner by law enforcement officers about a separate sex crime did not occur while the prisoner was in custody for purposes of Miranda.  __ U.S. at __, 132 S. Ct. at 1189.  The Court defined custody as follows:

> As used in our Miranda case law, "custody" is a term of art that specifies circumstances that are thought to present a serious danger of coercion.  In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the "objective circumstances of the interrogation," a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  And, in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation."
>
> Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last.  Not all restraints on freedom of movement amount to custody for purposes of Miranda.  We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda.  "Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not sufficient condition for Miranda custody."

Id. at __, 132 S. Ct. at 1189-90 (citations omitted).  The Court went on to hold that while the defendant's freedom of movement was restricted by his imprisonment, the coercive pressures of

10

station-house questioning were absent, and there was no Miranda custody. Id. at __, 132 S. Ct. at 1192. It reached this conclusion despite the facts that the defendant did not consent to the interview in advance and was not told he could decline to speak with the officers; the interview lasted between five and seven hours and well beyond the defendant's normal bedtime; the officers were armed; and one of the officers used a very sharp tone, and on one occasion, profanity. Id. at __, 132 S. Ct. at 1193.

¶ 21.    Howes was recently applied by the Michigan Supreme Court in Elliott, a decision that discusses and follows the teachings of both Murphy and Howes. In Elliott, the defendant parolee was incarcerated for failure to report to his parole officer as required. The parole officer added new charges to the violation complaint, including one related to a robbery for which the defendant had never been convicted, and visited the defendant in prison to serve the new complaint and determine whether the defendant would waive a probable cause hearing on the new complaint charges. During the meeting, the defendant confessed to the robbery for which he had never been charged. The Michigan Supreme Court held that the parole officer could testify to the defendant's confession to the robbery in a new criminal case for that crime over the objection that the officer failed to provide Miranda warnings before obtaining the confession. Elliott, 833 N.W.2d at 285. The court reasoned that the defendant was not in custody under Howes, specifically, that the environment did not present the same inherently coercive pressures as the type of station house questioning at issue in Miranda. Id. at 294-95. The court found the environment less coercive than that in Howes in a number of respects, noting, for example, that a parolee "would be aware that a parole officer is acting independently of the police who placed him in custody and has no control over the jail." Id. at 294.

¶ 22.    To that end, the above discussion shows that custody did not occur for purposes of Miranda, and we reject the dissent's assertion to the contrary based on its position that defendant was on furlough and knew he could be returned to incarceration without a court order if he did not cooperate with the probation officer by confessing to the conduct for which he was charged in the

11

resulting criminal proceeding. The theory that the restraints on liberty created by probation, parole, or furlough mean there is custody under <u>Miranda</u> is wrong. That theory was specifically rejected in <u>Murphy</u> and is wholly inconsistent with <u>Howes</u> and other, newer cases from the U.S. Supreme Court.

¶ 23. One other part of the trial court's rationale on this point deserves special mention and response. The trial court noted that although a probationer's statements to a probation officer are "admissible in violation-of-probation hearings," this "does not render custodial unwarned statements per se admissible in other criminal proceedings," and cites <u>Murphy</u> to that effect. This is obviously a misreading of <u>Murphy</u> because the facts of that case did involve questions that incriminated the probationer in a new criminal case, exactly the facts present here. The quote in <u>Murphy</u> on which the trial court relies relates to the situation where the State punishes a probationer for exercising his right to remain silent in response to questions, the answers to which would be incriminating. See <u>Murphy</u>, 465 U.S. at 435. Neither the defendant in <u>Murphy</u> nor defendant in this case exercised his right to remain silent.

¶ 24. The trial court's second rationale is that the procedure by which defendant's confession was obtained shows that custody was involved. Specifically, the trial court references the appearance of the probation officers at defendant's apartment, the "order" for defendant to sit on his sofa, the search of the apartment, and the nature of the questions. The short answer lies in a comparison of the circumstances in <u>Murphy</u> to those present here.

¶ 25. In <u>Murphy</u>, the defendant was called to a meeting with his probation officer at her office, albeit at a time convenient to him. The announced reason for the meeting was a pretext, a fact that the Supreme Court found that the defendant likely knew. When the defendant appeared, he was confronted with an accusation that he had committed a specific murder in the past and had confessed to this murder to his treatment provider who in turn told the probation officer of the confession. He responded that his confession was true.

12

¶ 26. In the instant case, two probation officers went to defendant's apartment in response to a complaint that defendant drilled a hole in his bedroom wall to look into the bedroom of a young girl in the adjoining apartment. Defendant admitted the two officers to the apartment, and one asked defendant to sit on the sofa while the other looked at defendant's bedroom wall. Both were unarmed and in plainclothes. The officer who remained with defendant asked him if there was something defendant should tell him. Defendant answered that he "screwed up." When the second officer returned and confirmed the holes drilled in the wall, the first officer asked defendant if he drilled the holes, and defendant answered that he did. All of this took a short period of time, a matter of minutes.

¶ 27. If the circumstances in Murphy did not show the defendant was in custody because of the location and substance of the questioning, it is difficult to conceive how the circumstances in this case could. Defendant here was not "yanked" from familiar to unfamiliar surroundings. The questioning did not take place in a stationhouse or even a probation office, but in defendant's own living room, with an officer he knew well and had worked with over several years.

¶ 28. In Beckwith v. United States, the Supreme Court ruled that an investigative interview of a defendant in a home where he occasionally stayed, rather than in a police-dominated atmosphere, "simply [did] not present the elements which the Miranda Court found so inherently coercive." 425 U.S. 341, 347 (1976). We have similarly held that the location of interrogation in a defendant's home is a significant indicator that the interrogation is not custodial. Sullivan, 2013 VT 71, ¶¶ 30-31 (concluding no Miranda warnings required when police did not restrict defendant's movements and "the interview took place in defendant's own home, under circumstances that did not resemble the sort of 'police-dominated atmosphere' that typically supports a finding of custody"). Many other courts have ruled similarly. See United States v. Murdock, 699 F.3d 665, 669 (1st Cir. 2012) (finding no custody when defendant was interviewed on his front lawn "in familiar surroundings"); United States v. Titemore, 437 F.3d 251, 260 (2d Cir. 2006) ("easily dispens[ing]" with defendant's claim he should have received Miranda

13

warnings when he was questioned on his porch and was not arrested or restrained in any way); Commonwealth v. Carnes, 933 N.E.2d 598, 606 (Mass. 2010) (finding no custody when nineteen-year-old interviewed "in a house owned by his family" over seventy-five minutes in "informal and cordial" manner). Moreover, the fact of defendant's furlough suggests that the circumstances of his questioning did not constitute a "sharp and ominous change." Howes, __ U.S. at __, 132 S. Ct. at 1190. Defendant knew he was on the "highest level of supervision" and that his probation officer was permitted to visit his residence at any time and inspect it for violations.

¶ 29. Further, the probation officer's initial questions were entirely open-ended. Even after the officers discovered the holes in the wall of defendant's bedroom, the questions focused on what had happened and were not accusatory. This is not a case like Muntean, where defendant was confronted by evidence against him, accused of a crime, and told that the interrogating police officer believed that defendant was guilty. 2010 VT 88, ¶¶ 28-29; see also State v. Hieu Tran, 2012 VT 104, ¶¶ 15-16, 193 Vt. 148, 71 A.3d 1201 (finding custodial setting where, during interview, detectives "explain[ed] they knew [the defendant] was involved in the crime and confront[ed] defendant with the existing evidence they had of his guilt").

¶ 30. The fact that the officers were questioning defendant in response to a complaint and that they searched defendant's bedroom are not indicators of custody. Virtually all of the cases cited in footnote five, supra, involve questioning in response to some suspicion of conduct that violated conditions of probation, parole, or furlough; indeed, virtually all cases involving the admissibility of evidence under the Miranda standard have those facts. Many of the cases with home interviews also involved searches. See McAllister, 807 A.2d at 1126 (determining Miranda warnings not required where probation officers searched probationer's home in response to tip and probationer "was in his own home, to which he had come freely, there were no police officers present, the probation officers were not armed or blocking his exit in any way, and the questioning was direct and brief"); Christensen, 360 P.3d at 352 (concluding interrogation was noncustodial when parolee was questioned in his own home, by his parole officer, in "low-key" and "relaxed"

14

manner for sixty minutes and noting fact police officers were simultaneously conducting a search of parolee's home "did not make the encounter police-dominated"); Hermosillo, 2014-NMCA-102, ¶¶ 26-29 (holding probationary home visit not transformed into custodial interrogation although defendant was handcuffed and told to remain seated while officers searched because visit occurred in defendant's home, "a non-custodial setting," defendant had tested positive for drugs and "could reasonably expect his probation officer might conduct a home visit to investigate these violations," defendant was not "isolated or overwhelmed by police presence" even though drug task force officer accompanied probation officer, and "there [was] no evidence of force in relation to the handcuffing, or isolation in a secure location, or confinement"); Hedlund, 2009 WL 1373670, at *2-3 (finding no custody for Miranda purposes although probation officer made unannounced visit to probationer's home accompanied by nonuniformed police officers in unmarked vehicle and conducted search because surroundings and officer were "familiar," probationer was aware "interviews were a necessary part of his conditions of release" and questions were straightforward). None cite these facts as significant indicators of custody.

¶ 31.    We acknowledge that at trial, the probation officer testified that defendant would not have been allowed to leave the apartment had he tried to do so once he confessed to the offense. But, we note that the consequence of an interrogation may be arrest of the person interrogated, even though that person was not in custody at the time of the interrogation, and, in many circumstances, the interrogator may have decided to arrest even before the interrogation. If the interrogator conveys belief in the defendant's guilt during the questioning, that communication can be a factor supporting that the defendant was in custody. See Hieu Tran, 2012 VT 104, ¶¶ 15-16; Muntean, 2010 VT 88, ¶ 19.  In this case, the probation officer said nothing about restraining defendant until after the confession, and defendant was in no way physically restrained throughout the course of the conversation with the probation officer. There is nothing in the record to suggest defendant knew the probation officer would not let him leave and that that knowledge had any bearing on his decision to give a statement.  See Kittredge, 2014 ME 90, ¶ 18 (noting that because

defendant "did not manifest any belief that he was not free to leave," this weighs against finding of custody); Elliott, 833 N.W.2d at 293 (determining that fact defendant was never told he was free to leave is not "particularly compelling, much less dispositive" considering brief—fifteen to twenty-five minutes—duration of interview).

¶ 32. We recognize that this is one area in which the circumstances differ from those in Murphy. In Murphy, the defendant was asked about a crime that occurred before the defendant was on probation. Thus, the probation officer had no jurisdiction over the conduct of the probationer at the time of the crime and thus could not restrain the defendant when he confessed to that conduct. In this case, the facts gathered by the probation officers in probationer's apartment and defendant's acknowledgement of his conduct during the inquiry determined that defendant would be restrained for violation of his probation conditions. While this is a difference, it is not a distinction that determines whether custody occurred. Virtually all of the post-Murphy cases are like this one, and not like Murphy on this point, and find no custody even though the defendant is not told that he or she is free to leave at any time.

¶ 33. There is another reason why this issue is not determinative. As the Court held in Howes, the fact that a probationer is not free to leave is a necessary but not sufficient element of custody. __ U.S. at __, 132 S. Ct. at 1189-90. The second element is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." __ U.S. at __, 132 S. Ct. at 1190. That second element is not met here.

¶ 34. We note that the trial court mistakenly relied on Steinhour, 158 Vt. 299, 607 A.2d 888, in reaching its decision. Steinhour was not a case in which the defendant claimed admission of evidence violated the prohibition of Miranda because the defendant was in custody and Miranda warnings were required. In fact, the defendant in Steinhour challenged the introduction of evidence in his probation violation proceeding, not its introduction in a separate criminal proceeding. We explicitly noted that the defendant in Steinhour "[did] not claim a failure to warn

16

him of his privilege against self-incrimination under <u>Miranda</u>"; rather, he argued that the circumstances of his questioning by his probation officer supported a reasonable belief that refusal to answer and assertion of the self-incrimination privilege "would itself be a ground to revoke probation," thus rendering his statements involuntary. <u>Id</u>. at 300, 607 A.2d at 889. We refused to address whether that belief was reasonable in <u>Steinhour</u>, particularly in the context of a separate criminal proceeding because the circumstances were hypothetical, although we noted the <u>Murphy</u> holding that punishing a defendant for invoking his right to remain silent would be unconstitutional. <u>Id</u>. at 301-02, 607 A.2d at 890.

¶ 35.    The trial court interpreted our statement in <u>Steinhour</u> that we were not addressing the situation where the State seeks to use statements from a probation interview in a separate criminal case as a holding that the result would be different in the latter circumstance. It then made the leap that the <u>Steinhour</u> holding would require <u>Miranda</u> warnings if the statements were to be admitted in the separate criminal case. We reiterate that the <u>Steinhour</u> language on which the trial court relied was not a holding, and <u>Steinhour</u> was not a <u>Miranda</u> case. In essence, the trial court interpreted <u>Steinhour</u> as holding that the Minnesota Supreme Court decision in <u>Murphy</u> was right and <u>Miranda</u> warnings would be required whenever statements from a probation officer interview were introduced in a separate criminal case. Such a decision would war directly with the Supreme Court's decision in <u>Murphy</u> and be beyond our power.

¶ 36.    There is an additional reason for our decision today. Scholars and courts have consistently read <u>Murphy</u> as effectively holding that probation officers are not required to give <u>Miranda</u> warnings before questioning those whom they supervise absent some form of police custody. See, e.g., 2 W. LaFave et al., Criminal Procedure § 6.10(c) (4th ed.) (noting "<u>Miranda</u> has been held inapplicable to questioning by . . . parole or probation officers"); T. Jacobi et al., <u>The Attrition of Rights Under Parole</u>, 87 S. Cal. L. Rev. 887, 923 (2014) (explaining that under <u>Murphy</u>, "the typical parole interview does not constitute custody despite the fact that parole officers could compel [a parolee's] attendance and truthful answers" because "such seeming

17

compulsion alone does not transform[] a routine interview into an inherently coercive setting," and parolee's nonMirandized statements can be used against him or her in criminal case as well as in parole revocation hearings (quotations omitted)); S. Vance, Looking at the Law: An Updated Look at the Privilege Against Self-Incrimination in Post-Conviction Supervision, Fed. Prob., June 2011, at 33, 37 (explaining that probation officer can ask incriminating question of offender on post-conviction supervision, and officer is not required to read Miranda rights to offender unless offender is in "some type of police custody").

¶ 37. The above findings comport with the nature and purposes of probation. Because the "primary goal of probation . . . is rehabilitation of the defendant," the relationship between a defendant and his or her probation officer should not be founded on fear, intimidation, or authoritarianism, but on trust, openness, and the commonly held goal of restoring the defendant to useful and productive citizenship. State v. Burdin, 924 S.W.2d 82, 86 (Tenn. 1996); see also 28 V.S.A. § 252(a) (noting that court may impose conditions of probation deemed reasonably necessary "to ensure that the offender will lead a law-abiding life or to assist the offender to do so"). Furlough, particularly long-term furlough as in this case, has similar purposes.

¶ 38. Treating probation officers as law enforcement officers primarily motivated to secure convictions for crimes and required to give Miranda warnings to those they supervise erects a substantial barrier to the development of forthright, open communication between probation officers and those they supervise. The facts of this case show exactly the difference. Defendant had been in the same status under furlough for five years, longer than most periods of probation. The probation officer in this case had supervised him for all that time, during which they met approximately twice a week. The pair had a "good relationship." Defendant had admitted other violations of his furlough conditions without resulting imprisonment. The officer testified that his goal was to "have an honest, open relationship" with his clients so that "if they were struggling and in need, they could come to [him] and say I need help with this," and receive appropriate treatment. Miranda was built around a wholly different paradigm, one in which police officers

18

who have no relationship with a crime suspect use a coercive environment and interrogation techniques to extract a confession.

¶ 39.   The standard <u>Miranda</u> warning requires the officer to tell the suspect that he or she has a right to remain silent and anything the suspect says can and will be used against him in a court of law.  The routine giving of these warnings in the context where the officer must inquire about compliance with probation, parole, or furlough conditions and the answers may disclose conduct a prosecutor could charge as criminal would undermine an atmosphere of trust and communication.  The warnings would identify a probation officer as just another police officer, who is an adversary of the defendant.

¶ 40.   For the above reasons, we reverse the trial court's decision to suppress the first set of defendant's statements to his probation officer.

¶ 41.   We next address defendant's statements during the second conversation with his probation officer.  The trial court suppressed these statements based on the same rationale it used for the first interview—that the statements were not admissible without <u>Miranda</u> warnings under the holding in <u>Steinhour</u>.  That rationale was erroneous.

¶ 42.   However, that this rationale was erroneous does not end the inquiry.  A court must still determine if defendant was in custody under traditional factors at the time of the second interview, and it is undisputed that defendant was physically restrained in a DOC facility at the time of that interview.

¶ 43.   Given the rationale for its decision, the trial court made few findings about the environment and circumstances of the second interview.  The probation officer's testimony during the trial and the motion hearing indicates that defendant was transferred into shackles and leg restraints upon his arrival at the DOC office, and that after being taken outside for a cigarette, defendant and the probation officer returned to the DOC office where the officer "started" a

conversation with defendant about the holes he had found in the apartment wall.[6] However, the record contains no information regarding the number, kind, or tone of the questions the probation officer posed to defendant. The record also does not contain information about whether defendant was still wearing restraints after returning to the DOC office from smoking a cigarette outside, a negative finding that is "qualitatively different from stating that [the defendant] was free to move about," rendering it "impossible to determine if [defendant] retained his freedom of movement through the questioning." United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006).[7] Although it is undisputed that defendant was "not free to leave," under Howes we must find both that defendant was not free to leave and that the questioning was done in a coercive environment comparable to the station house atmosphere in Miranda. __ U.S. at __, 132 S. Ct. at 1189. The trial court made no findings on this second element.

¶ 44. We recognize that defendant has the burden of proof to establish custody for Miranda purposes and thus is responsible for deficiencies in the record. In re E.W., 2015 VT 7, ¶ 10. Nevertheless, the evidence available shows factors that support a conclusion that defendant was in custody for Miranda purposes: the prior confessions to the probation officer and the police officer, the prior accusations of the police officer, his arrest on the probation violation charges so that he was held involuntarily, the location of the interview under either version of the facts, and his isolation from the outside world. Much of the State's argument is based on Howes. The Howes holding is that an interrogation in prison, in a private location, and with respect to actions that took

---

[6] We note, however, that the State's response to defendant's supplemental memorandum in the trial court states that the conversation occurred in the parking lot of the DOC office while the two men were smoking and that defendant began to "spontaneously talk" and provide additional information without being prompted. By contrast, the trial court's decision on the motion to suppress states that "in answer to more inquiries," defendant admitted additional information.

[7] Moreover, even if defendant was restrained during the conversation, the Supreme Court has emphasized that "[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda" and "declined to accord talismanic power to the freedom-of-movement inquiry," focusing instead on whether the coercive pressures of the station house are present. Howes, __ U.S. at __, 132 S. Ct at 1189 (quotation omitted).

place outside is not per se custodial for purposes of <u>Miranda</u>. 132 S. Ct. at 1189. While the analysis may be helpful to the State's argument, it is not determinative.

¶ 45. On the sparse evidence presented, we would conclude that it is impossible to determine as a matter of law whether defendant was in custody for purposes of <u>Miranda</u> without findings of fact derived from the evidence that was presented. Consequently, we reverse the decision to suppress the statements made in the second interview with the probation officer and remand for additional findings of fact on the issue of custody.

<u>The trial court's order suppressing defendant's first set of statements to his probation officer is reversed; its decision as to the second set of statements is reversed and remanded for proceedings consistent with this opinion</u>.

FOR THE COURT:

Associate Justice

¶ 46. **SKOGLUND, J., dissenting.** I dissent. This was not a typical, routine interview of a parolee or furloughee. This was a special visit to respond to an allegation that defendant had committed a crime. The totality of the circumstances shows that defendant was "in custody" when he made involuntary, incriminatory statements to his supervising Department of Corrections (DOC) officer, and therefore his statements should be suppressed. I would affirm the trial court's decision.

¶ 47. Under the Fifth Amendment to the U.S. Constitution, an individual is privileged "not to answer official questions put to him . . . where the answers might incriminate him in future criminal proceedings." <u>Minnesota v. Murphy</u>, 465 U.S. 420, 426 (1984) (quotation omitted); U.S. Const. amend. V (stating that no person "shall be compelled in any Criminal Case to be a witness against himself"). "A defendant does not lose this protection by reason of his conviction of a crime." <u>Murphy</u>, 465 U.S. at 426. Thus, even if a defendant is "on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent

21

trial for a crime other than that for which he has been convicted." Id. And, just to be clear, defendant was not on probation, he was under the "highest level" of furlough supervision. Furlough "shall in no way be interpreted as a probation or parole of the offender." 28 V.S.A. § 808(c).

¶ 48. Although generally an individual must assert his or her Fifth Amendment right to be entitled to its protection, an exception is made for statements "obtained during custodial interrogation." Murphy, 465 U.S. at 430; Miranda v. Arizona, 384 U.S. 436, 444 (1966) (explaining that "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"). This is because "the custodial setting is thought to contain 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' " Murphy, 465 U.S. at 430 (quoting Miranda, 384 U.S. at 467). Thus, "[t]o dissipate the overbearing compulsion caused by isolation of a suspect in police custody," law enforcement officers must warn individuals of their right to remain silent and warn them of the consequences of failing to assert such right before engaging in any custodial interrogation. Id. (quotation and alterations omitted). If the warnings are not provided, any incriminatory statements must be suppressed. Id. (explaining that courts must exclude "incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it").

¶ 49. The Supreme Court has identified a two-part test to determine if an individual is "in custody" for Miranda purposes. Howes v. Fields, __ U.S. __, __, 132 S. Ct. 1181, 1189 (2012). Courts must first consider if, "in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." Id. (quotations omitted). This requires an examination of "all of the circumstances surrounding the interrogation," including "the location of the questioning, its duration, statements

22

made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Id. (quotations omitted). Because "[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda," courts must also ascertain if "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Id. at 1189-90.

¶ 50.　Here, because defendant was on furlough status, he could be returned to jail without any evaluation by a court of the reasons for his re-incarceration. In State v. Bogert, this Court recognized that "the restraints on defendant's individual liberty associated with his conditional-reentry status are significant." 2013 VT 13A, ¶ 24, 197 Vt. 610, 109 A.3d 883. According to the testimony of his supervising correctional officer, the officer could enter the defendant's apartment without permission and could search it without any warrant. And, he could put defendant in custody while searching the residence. As an example of this, he testified that he could order a person on furlough to "stay seated in a primary location so we can conduct the search."

¶ 51.　In Murphy, the Supreme Court concluded that a probationer was not "in custody" during a "probation interview, arranged by appointment at a mutually convenient time" and therefore reversed the decision of the Minnesota Supreme Court that had suppressed Murphy's incriminating statements to his probation officer that implicated him in another crime. 465 U.S. at 433. In Murphy, the probation officer wrote to Murphy and asked him to contact her to discuss a treatment plan for the remainder of his probationary period. In actuality, the meeting was in direct response to her learning that Murphy had admitted committing a rape and murder to his counselor in the required program for sexual offenders, and she intended to report any incriminating statements that Murphy made during the interview to police. Id. at 422-23. Murphy admitted to the crimes during the interview. Id. at 423. Murphy was not detained at the end of the interview. The probation officer informed the police of Murphy's admissions, and he was subsequently indicted for first-degree murder.

¶ 52.   As indicated, the Supreme Court determined that Murphy was not in custody during the probation meeting.  It found that the meeting did not convey to Murphy "a message that he has no choice but to submit to the officers' will and to confess," nor did it thrust him into "an unfamiliar atmosphere or an interrogation environment created for no purpose other than to subjugate the individual to the will of his examiner."  Id. at 433 (quotation and alterations omitted).  The Court explained that Murphy met regularly with his probation officer at her office, and that these regular meetings "should have served to familiarize him with her and her office and to insulate him from psychological intimidation that might overbear his desire to claim the [Fifth Amendment] privilege."  Id.

¶ 53.   While the majority believes "Murphy answers much of defendant's argument on the special need for Miranda warnings in probation officer interview cases where the State seeks to admit the result of that interview in a separate criminal case," ante, ¶ 15, reliance on Murphy cannot decide the issue in this case; too many factors distinguish Murphy from this case.  Again, defendant here was on furlough, not probation.  And, while the Supreme Court found no custodial setting and no compulsion involved in Murphy's questioning and, thus, did not suppress his statements, it acknowledged: "The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution."  Murphy, 465 U.S. at 435.

¶ 54.   Defendant here was in a custodial situation for Miranda purposes.  His supervisor said as much when he testified that he directed defendant to sit on the couch while a search was conducted and that he did not leave defendant alone until the other correctional officer came downstairs to watch over defendant.  Defendant understood that his furlough status could be immediately revoked if he failed to answer his DOC supervisor's questions without the need for the supervisor to resort to the procedures offered for a probationer when charged with a violation of probation conditions.  He had already received four graduated sanctions for prior incidents, with one resulting in incarceration.  While the questioning occurred in defendant's home and he

knew his supervising officer well, it is disingenuous to label this visit as a typical "probation interview, arranged by appointment at a mutually convenient time" as in Murphy. Id. at 433. The record shows that defendant's supervising officer, and a second DOC officer, went to defendant's home specifically in response to a report that defendant was suspected of committing a new crime.

¶ 55. This record compels a finding of custody. It is significant that defendant did not "arrive[] at the interview voluntarily," or leave "by his . . . own free will." State v. Muntean, 2010 VT 88, ¶ 19, 189 Vt. 50, 12 A.3d 518. Moreover, the focus of the interview was not on the terms of defendant's furlough agreement but rather on investigating suspicions of involvement in new criminal acts. Cf. State v. Steinhour, 158 Vt. 299, 302, 607 A.2d 888, 890 (1992) ("The purpose of a probation officer's questions about the probationer's behavior related to and affecting his probation is ordinarily not aimed at ferreting out evidence to support an additional criminal prosecution."). While the interview occurred in defendant's home, this is not by itself determinative of the totality-of-the-circumstances inquiry. Muntean, 2010 VT 88, ¶ 19. As one court has explained, "[q]uestioning which occurs in the suspect's own home may provide a margin of comfort, but . . . the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting." United States v. Griffin, 922 F.2d 1343, 1354-55 (8th Cir. 1990).

¶ 56. During their conversation, the officers never told defendant that he did not have to answer their questions or that he was free to terminate the interview. Like other courts, we have found this type of disclosure "significant in determining whether a reasonable person would have felt at liberty to terminate a police interview." Muntean, 2010 VT 88, ¶ 25 (citing cases). Indeed, we found the absence of such a statement pivotal in both Muntean and State v. Hieu Tran, 2012 VT 104, ¶ 14, 193 Vt. 148, 71 A.3d 1201. In this case, defendant could not have reasonably believed he could have terminated the interview.

¶ 57. While the conversation here may have been short, the questions were not open-ended as the majority posits. Ante, ¶ 29. The supervising officer repeatedly asked defendant if

25

he had anything to report, conveying the officer's belief that there had been slippage on defendant's part. Then, defendant was confronted with evidence of a new crime by the discovery of drilled holes in defendant's bedroom that looked into the adjoining unit. Prior to that announced discovery, defendant said only that he had "screwed up." The confrontation of defendant with evidence suggesting his guilt of a serious crime contributed significantly to the coercive atmosphere. See, e.g., Hieu Tran, 2012 VT 104, ¶ 15 (concluding that "the content of the [detectives'] questioning created a custodial atmosphere because throughout the interview the detectives repeatedly confronted defendant with evidence of his guilt"); Muntean, 2010 VT 88, ¶ 29 (finding it significant to custody analysis that "during the interview defendant was accused of committing a serious crime and confronted with evidence of his guilt"). As explained in Muntean, a reasonable person confronted with such evidence "would not feel at liberty to terminate a police interview" because "a reasonable person understands that the police ordinarily will not set free a suspect when there is evidence strongly suggesting that the person is guilty of a serious crime." Id. ¶ 28 (quotation omitted).

¶ 58. This leads to another important distinction between the instant case and Murphy. The probationer in Murphy was free to leave the probation interview. The Supreme Court emphasized that Murphy was free to leave during the interview and did in fact leave the interview without being arrested despite confessing to rape and murder. Murphy, 465 U.S. at 433, 434 n.5. This was a significant part of the Court's calculus. Unlike Murphy, defendant was not free to leave the interview "by his . . . own free will" even before he admitted drilling the holes and was handcuffed behind his back. Muntean, 2010 VT 88, ¶ 19; see also Howes, __ U.S.__, 132 S. Ct. at 1189 (stating that one relevant factor in custody analysis is "the release of the interviewee at the end of the questioning"); Hieu Tran, 2012 VT 104, ¶ 15 (finding it significant in custody analysis that officers repeatedly confronted defendant with evidence of his guilt, communicated that defendant could be arrested for a serious offense based on that evidence, and did in fact arrest defendant at the close of the interview).

26

¶ 59. Again, defendant was not on probation. He was on furlough. And, while his furlough status alone is not sufficient basis to require a <u>Miranda</u> warning, see <u>State v. LeClaire</u>, 2003 VT 4, ¶ 16, 175 Vt. 52, 819 A.2d 719, the conditions of his furlough are strong evidence that he was not free to leave when confronted by his probation officer. In fact, he was directed to stay on his couch, an action the supervising officer testified was a means of putting a person on furlough "in custody" for safety purposes while conducting a search. No reasonable person in defendant's position would have felt free to terminate the interview. Here, "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in <u>Miranda</u>." <u>Howes</u>, 132 S. Ct. at 1189-90.

¶ 60. Other courts have reached similar conclusions in cases that involved alleged "parole interviews." See <u>Commonwealth v. Cooley</u>, 118 A.3d 370, 379-80 (Pa. 2015) (concluding that "no mere parole interview" occurred where parolee was immediately handcuffed after voluntarily appearing at parole office, accused of crimes for which he was not on parole, "there was no 'interview' or dialogue related to the conditions of his parole or parole violations," he was not told that he was not under arrest or that he was being handcuffed pursuant to routine police, but was instead informed that he was being investigated for new crimes, and agents' interrogation and search of parolee's home "was unquestionably aimed at crimes for which he was not on parole"); see also <u>People v. Coleman</u>, 2015 IL App (4th) 140730, 37 N.E.3d 360 (concluding that parolee was subject to custodial interrogation where parole officer was looking for parolee because of tips indicating parolee had committed new crime, parolee was separated from other people in house, parole agents were armed and parolee was required to cooperate, and parolee was handcuffed and then questioned about an independent crime).

¶ 61. The trial court's reliance on <u>State v. Steinhour</u>, 158 Vt. 299, 607 A.2d 888 (1992), was not misplaced. While in <u>Steinhour</u> the State sought to use the defendant's admissions to marijuana use from a probation interview in a violation of probation hearing and not to support a separate criminal charge, the implication of the holding in <u>Steinhour</u> for this case is not a leap.

27

This Court wrote: "if [the] defendant is guilty of conduct which is a violation of probation, . . . his answers are relevant and may be used against him in the revocation hearing. That is because defendant is not being compelled to give statements to be used against him in a criminal proceeding." Id. at 300, 607 A.2d at 889. The Court noted that Steinhour had not been charged criminally with using marijuana and that, if he had been, "a motion to suppress would stand squarely in both the Fifth Amendment and Article 10." Id. at 301, 607 A.2d at 889. It then quoted from Minnesota v. Murphy:

> "There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution."

Id. (emphasis added) (quoting Murphy, 465 U.S. at 435).

¶ 62. This Court supported the Steinhour analysis four years later in State v. Cate, 165 Vt. 404, 683 A.2d 1010 (1996). In Cate, the defendant argued that the probation condition requiring him to admit his guilt as part of sex-offender therapy should be stricken because it violated his Fifth Amendment and Article 10 rights against self-incrimination. We adopted the reasoning of the federal district court in Mace v. Amestoy, which held that when an individual asserts the privilege against self-incrimination, the Fifth Amendment " 'privileges [a person] not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings . . . unless and until he is protected at least against the use of his compelled answers.' " 765 F. Supp. 847, 850 (D. Vt. 1991) (quoting Murphy, 465 U.S. at 426). We held that a person in a probation setting cannot be forced to incriminate himself without first receiving immunity from criminal prosecution as a result thereof. Cate, 165 Vt. at 415, 683 A.2d at 1018.

¶ 63. The circumstances surrounding the second set of incriminatory statements to the probation officer are even more indicative of a custody status. I would not remand this question,

28

but rather conclude on these facts that defendant was subjected to custodial interrogation while in the probation office. Defendant was "arrested or detained" at his apartment and placed in handcuffs. It is clear that defendant was not free to leave. See LeClaire, 2003 VT 4, ¶ 16 ("To determine whether an individual is in custody for Miranda purposes, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (quotation omitted)); see also Cooley, 118 A.3d at 379 (recognizing that while the use of handcuffs is not dispositive of custody analysis, it is "generally recognized as a hallmark of a formal arrest" (quotation omitted)). Even the State agreed below.

¶ 64. After the investigating police officer provided what the trial court found were inadequate Miranda warnings at the home, defendant was transported to the DOC office in restraints. He was again interrogated by his supervising DOC officer and admitted the holes in the wall had been made some three months earlier, and that he had seen his minor female neighbor when she was naked or wearing underwear. Defendant's supervising DOC officer made these further inquiries because he felt that he needed to have full information in making a decision about whether to release defendant. This excuse strains credulity. The confrontation by the supervising officer occurred on April 3. One day later, on April 4, defendant was arraigned on fourteen misdemeanors of voyeurism and stalking. Defendant was not going to be released.

¶ 65. The police officer was told of defendant's further remarks. When the officer arrived at the DOC office, he did not inform defendant of his Miranda rights. Defendant then confirmed what he had told his supervising officer. The court found the evidence unclear as to whether defendant remained handcuffed at the DOC office. The State concedes that defendant was not free to leave during his conversation with his supervising DOC officer as "he was being processed to return to jail," but questions whether defendant was wearing any kind of restraints at that point. Given all of the indicia of custody, we do not need to discern if defendant was actually wearing restraints during his conversation with his supervising DOC officer. Any reasonable person under these circumstances would understand that he or she in custody, and the

29

circumstances here present all of the indicia of coercion that <u>Miranda</u> warnings are designed to protect against.

¶ 66.    The interview was custodial, defendant's statements were coerced, and they should not be admissible in the criminal proceeding.  I would affirm the trial court's decision, and suppress both sets of defendant's statements.

¶ 67.    I am authorized to state that Justice Robinson joins this dissent.

_____

Associate Justice